931 F.2d 1320
 30 Wage & Hour Cas. (BN 441, 118 Lab.Cas. P 35,480
 Carral Raymond GILBREATH, Plaintiff-Appellant,
v.
CUTTER BIOLOGICAL, INC.; Miles Laboratory, Parent
corporation of Cutter Biological, Defendants-Appellees.
Donald Eugene YOUNG; Sonny Metcalf; Kenneth O. Ashelman;
James Delbert Scott; Jose Alvarez Cardenas;
Danny L. Try; Charles L. Boylan; Gary
Keith Griffin; Donald A. Joy,
Plaintiffs-Appellants,
v.
CUTTER BIOLOGICAL, A DIVISION OF SCRIPT MILES LABORATORIES;
Norman L. Gray, Manager; Darrell Esteson, Manager
of Cutter Biological as Arizona State
Prison at Florence,
Defendants-Appellees.
Donald Eugene YOUNG; Sonny Metcalf; Kenneth O. Ashelman;
James Delbert Scott; Jose Alvarez Cardenas;
Danny L. Try; Charles L. Boylan; Gary
Keith Griffin; Donald A. Joy,
Plaintiffs-Appellants,
v.
CUTTER BIOLOGICAL, A DIVISION OF SCRIPT MILES LABORATORIES;
Norman L. Gray, Manager; Arizona Department of Corrections,
a Division of the State of Arizona, et al.; State of
Arizona; Samuel Lewis; James Ricketts; Robert Goldsmith,
Warden, Defendants-Appellees.
 Nos. 87-2831, 88-15466 and 89-15658.
 United States Court of Appeals,
 Ninth Circuit.
Argued and Submitted Oct. 3, 1989.
Decided April 22, 1991.
 
 Michael E. St. George, St. George & Reed, Tempe, Ariz., for plaintiffs-appellants.
 June Ava Forescue, Asst. Atty. Gen. and Tibor Nagy, Jr., Snell & Wilmer, Phoenix, Ariz., for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before D.W. NELSON, TROTT and RYMER, Circuit Judges.
 TROTT, Circuit Judge:
 
 SUMMARY
 
 1
 Appellants, inmates in an Arizona penitentiary, appeal the dismissal of their action seeking damages, alleging the state did not pay them minimum wages for work in prison industry. They claim wage protection under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. Secs. 201-219 (1989), and Arizona law. They also claim they have been denied without due process their property interest in the funds due them under state law, in violation of 42 U.S.C. Sec. 1983. The district court's judgment is affirmed.FACTS
 
 
 2
 Plaintiffs are incarcerated in the Arizona State Prison at Florence, Arizona. During their incarceration, they worked in various capacities at a "plasma center" located at the institution and operated by defendant Cutter Biological ("Cutter"), a division of Scripps Miles Laboratory, pursuant to a contract between Cutter and the Arizona Department of Corrections ("Department"). Cutter operated at the institution for approximately twenty-one years.[1]
 
 
 3
 Under the contract, the Department assigned prisoners to the plasma center to act as assistants to Cutter's technical staff. All inmates so assigned were approved for that work at the direction and discretion of the Department. The plasma center was required to pay the Department twelve dollars per week for each prisoner who worked at the center. This compensation for services was paid directly to the Inmates' Account Office of the Department. Pursuant to Arizona law, the Department retained control over the disposition of all compensation paid by Cutter to the Inmates' Accounts Office. No oral or written agreement existed between the plasma center and the inmates regarding compensation or conditions of employment.
 
 
 4
 Cutter did not have the power to hire and fire inmates, although it did request some prisoner assignments and removals over the years covered by the contracts. Nor did Cutter maintain employment records for the inmates. Cutter did have day-to-day supervision of the inmates' work responsibilities. The Department maintained control over the inmate workers to the extent it determined which inmates were eligible to work. It also maintained security over them as it did over all other inmates in its care and custody. State law requires that inmates work and be paid for their labor. Ariz.Rev.Stat.Ann. Sec. 31-251(A) (1989).
 
 
 5
 Plaintiffs filed a complaint in district court against the state defendants and Cutter, alleging they had been denied minimum wages for their work performed at Cutter, in violation of state and federal law. First, plaintiffs complained they were not granted the minimum wage required by the FLSA, alleging (1) they were "employees" as defined by section 203(e)(1) and (2) defendants were "employers" as defined by section 203(d) of that statute. Second, plaintiffs sought relief under Arizona statutes, Ariz.Rev.Stat.Ann. Secs. 31-254(A) and 41-1624.01 (1989), alleging these and related statutes require that inmates engaged in correctional industries programs pursuant to sections 41-1621 through 41-1629 receive the minimum wage.
 
 
 6
 Plaintiffs also sought relief under 42 U.S.C. section 1983, alleging that the Department's failure to provide minimum wages mandated by Arizona statutes for inmates working for private parties under contract with the Department resulted in the inmates being deprived of a liberty interest without due process of law.
 
 
 7
 The district court granted summary judgment against plaintiffs on their FLSA claims, finding that defendants were not employers as contemplated by the FLSA. 694 F.Supp. 651. The court also granted summary judgment in favor of defendants on plaintiffs' state law claims, finding that the Eleventh Amendment acted as a bar to plaintiffs' claims against Arizona for the back-pay relief requested.
 
 
 8
 The court granted summary judgment to Cutter on plaintiffs' section 1983 claim. With reference to the state defendants, the court granted partial summary judgment in their favor, reasoning that although it lacked subject matter jurisdiction to hear the underlying state law claims, it could retain jurisdiction to hear the section 1983 suit against the state defendants. The court held that if plaintiffs were to prevail on the remaining section 1983 claims, the court could grant prospective relief that would not violate the Eleventh Amendment.
 
 ANALYSIS
 
 9
 * Notice of Appeal
 
 
 10
 Appellees argue that appellants have failed to comply with Rule 3(c) of the Federal Rules of Appellate Procedure. Rule 3(c) provides in pertinent part:
 
 
 11
 The notice of appeal shall specify the party or parties taking the appeal ...
 
 
 12
 The Notice of Appeal reads: "Come now plaintiffs, as consolidated into this cause and do hereby appeal the judgment of this court...." As appellees note, the Supreme Court has held that "although a court may construe the Rules liberally in determining whether they have been complied with, it may not waive the jurisdictional requirements of Rules 3 and 4, even for 'good cause shown' under Rule 2, if it finds that they have not been met." Torres v. Oakland Scavenger Co., 487 U.S. 312, 317, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). The instant case, however, is distinguishable from Torres. In Torres, one party in a multiparty suit was missing from the notice of appeal due to a clerical error. Under that circumstance, there was no reason for opposing counsel to believe the unnamed party would be a party to the appeal. By contrast, appellants in this case accurately listed the parties to the appeal by describing them as all plaintiffs consolidated below. There was no need for appellants to list each party individually, since appellees could have covered their identities by referring to records of the lower court proceedings. The policy behind Rule 3(c) thus was adequately served.
 
 II
 The FLSA Claim
 A. Eleventh Amendment Immunity
 
 13
 Appellants argue that the FLSA mandates minimum wage for their hours worked in prison industry. To decide this issue, we must first determine if the FLSA pierces all the states' Eleventh Amendment immunity, and second, whether these prisoners enjoyed with the state an "employee-employer" relationship as that relationship is understood by the FLSA.
 
 
 14
 The FLSA was enacted in 1938. It requires employers to pay employees a minimum hourly wage and overtime pay. 29 U.S.C. Secs. 201-219 (1988). Its essential purpose is to provide for workers a "minimum standard of all living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. Sec. 202. Originally, states and their political subdivisions were expressly excluded from the coverage of the FLSA. 29 U.S.C. Sec. 203(d) (1958) (current version at 29 U.S.C. Sec. 203(d) (1988)). In 1966, Congress amended the FLSA to extend coverage to employees of state schools, hospitals, and nursing homes. 29 U.S.C. Sec. 203(d), (s)(4) (1970) (current version at 29 U.S.C. Sec. 203(d) (1988)). In Employees of the Dept. of Pub. Health & Welfare v. Dept. of Pub. Health & Welfare, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the Supreme Court held that although the FLSA had been extended to some state employees by the 1966 amendments, the state itself was immune from suits brought by its employees because the Eleventh Amendment precluded such suits. The Court stated:
 
 
 15
 [W]e have found not a word in the history of the 1966 amendments to indicate a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in federal courts.... It would also be surprising in the present case to infer that Congress deprived Missouri of her constitutional immunity without changing the old Sec. 16(b) under which she could not be sued or indicating in some way by clear language that the constitutional immunity was swept away.
 
 
 16
 Id. at 285, 93 S.Ct. at 1618. While the employees could not bring an action against the state, however, they were not totally without a remedy as the Secretary of Labor could bring an action against the state for unpaid minimum wages or unpaid overtime violations on their behalf. Id. at 285-86, 93 S.Ct. at 1618-19.
 
 
 17
 The history of whether state employees fall within the coverage of the FLSA is marked by considerable interplay between various branches of government. In 1974, Congress amended the FLSA, extending its protections to almost all state employees. 29 U.S.C. Sec. 203(d), (x) (1976) (current version in 29 U.S.C. Sec. 203(d) (1988)). Then, in National League of Cities v. Usery, 426 U.S. 833, 852, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court ruled that Congress was without authority to extend FLSA coverage to state employees in "areas of traditional governmental functions." In 1985, however, the Supreme Court reversed field and overruled National League of Cities in Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), holding that, "[w]e therefore now reject, as unsound in principal and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.' " 469 U.S. at 546-47, 105 S.Ct. at 1015-1016. The result of Garcia was to bring all employees of the states and their political subdivisions within the full coverage of the FLSA. Ackinclose v. Palm Beach County, 845 F.2d 931, 933 (11th Cir.1988).
 
 
 18
 In 1985, Congress amended the FLSA to alleviate temporarily the financial burden on states caused by Garcia. The states were given until April 15, 1986 to conform their procedures to the FLSA. Pub.L. No. 99-150, 99 Stat. 787 Sec. 2(c)(1) (1985), 29 U.S.C. Sec. 216 (historical note) (1988). Contrary to appellees' arguments, it is clear that the FLSA's protection now extends to state employees.
 
 B. The Employer-Employee Relationship
 
 19
 Appellants argue that they enjoy an employee-employer relationship with the State of Arizona, and that Cutter Biological and the state were "joint employers." Under the FLSA, an employer "include[s] any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency...." 29 U.S.C. Sec. 203(d) (1988). "In the case of an individual employed by a public agency, such term means ... any individual employed by a State...." 29 U.S.C. Sec. 203(e)(2)(C) (1988).
 
 
 20
 The Supreme Court, in a non-prisoner case, has articulated an "economic reality test" to be considered in deciding if an employee-employer relationship exists. In Goldberg v. Whitaker House Coop., 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961), the court held that a determination under the FLSA of whether an employment relationship exists should be based on the "economic reality" of the employment situation. The Court did not specify the factors to be weighed in this evaluation.
 
 
 21
 This circuit, in deciding if an employer-employee relationship exists, has applied an "economic reality" test which identifies four factors:
 
 
 22
 whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.
 
 
 23
 Bonnette v. California Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir.1983).[2] However, these particular factors are merely guidelines; "they are not etched in stone and will not be blindly applied." Id. "The determination of whether an employer-employee relationship exists does not depend on 'isolated factors but rather upon the circumstances of the whole activity.' " Id. at 1469 (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947)).
 
 
 24
 Appellees argue that we should not reach the economic reality issue, claiming the FLSA does not apply to prison inmates as a class. I believe this argument has merit. A review of the FLSA in the light of its evident purpose and legislative history, conducted with an eye guided by common sense and common intelligence, leads me to the inescapable conclusion that it is highly implausible that Congress intended the FLSA's minimum wage protection be extended to felons serving time in prison. This is a category of persons--convicted murderers, rapists, burglars, armed robbers, swindlers, thieves, and the like--whose civil rights are subject to suspension and whose work in prison could be accurately characterized in an economic sense as involuntary servitude, peonage, or indeed slavery--all of which are prohibited by law--were it not for the exceptions carved out by the courts from these prohibitions for persons "duly tried, convicted, sentenced and imprisoned for crime in accordance with law." Draper v. Rhay, 315 F.2d 193, 197 (9th Cir.), cert. denied, 375 U.S. 915, 84 S.Ct. 214, 11 L.Ed.2d 153 (1963) (citing Lindsey v. Leavy, 149 F.2d 899, 901-02 (9th Cir.), cert. denied, 326 U.S. 783, 66 S.Ct. 331, 90 L.Ed. 474 (1946)). Not a word can be found anywhere in the relevant statutes or authorities indicating an intent by Congress to include such a distinctive class of "workers" in the FLSA. It is true as observed by the Second Circuit in Carter v. Dutchess Community College, 735 F.2d 8, 13 (2d Cir.1984), that prisoners are not explicitly excepted in the statutes from FLSA coverage, but I find singularly unconvincing the Second Circuit's argument that the statutory scheme's failure to include "prisoners" on what it terms "an extensive list"[3] of workers who are excepted expressly from FLSA coverage provides somehow a rationale to bring them within the statute's mandate. This argument begs the question. It presupposes an affirmative answer to the key underlying question of whether prisoners who work are workers within the meaning of the statutory scheme at issue.[4] It is equally plausible, indeed more so, that in view of the manifest purpose of Congress in enacting the FLSA, it did not cross any member's mind--even for a moment--that felons serving hard time in prison and working in the process would be covered by this economic protection. I reject as almost whimsical the notion that Congress could have intended such a radical result as bringing prisoners within the FLSA without expressly so stating. There are obvious policy considerations in such a result that should be openly addressed by Congress, not the courts.
 
 
 25
 My conclusion is bolstered when I apply to this unique situation the economic realities test. The results of such application reveal why the FLSA itself cannot be said to cover prison labor and why no employer-employee relationship can be found to exist between Arizona and inmates who worked in Cutter's lab.
 
 
 26
 The proper starting point in such an analysis is the state's complete control over Arizona's inmates. Not only does the state provide the inmates' food, shelter, and clothing, but it is only with the state's permission that prisoners are allowed the privilege of working. The state's absolute power over appellants is a power that is not a characteristic of--and indeed is inconsistent with--the bargained-for exchange of labor which occurs in a true employer-employee relationship. Arizona's prisoners have no economic need for the FLSA, none.
 
 
 27
 My judgment in this respect is informed by the law of Arizona concerning the status of prisoners working in ARCOR, an acronym for Arizona Correctional Enterprises. Ariz.Rev.Stat.Ann. Sec. 31-251A (1989) declares that: "Each able-bodied prisoner under commitment to the state department of corrections shall engage in hard labor for not less than forty hours per week ..." (emphasis added); and section 31-251E states bluntly that
 
 
 28
 "notwithstanding any other law, no prisoner given a work assignment or required to perform any labor by the department of corrections shall be considered an employee or to be employed by the state or the department of corrections, regardless of whether the prisoner is compensated or not, nor shall an employee-employer relationship exist between the prisoner and the department of corrections or the state for any purpose and none of the rights or privileges otherwise accorded to employees by law shall accrue to such prisoners."ARCOR enterprises was established in 1969. It currently provides for "industries [and] enterprises" to be "conducted for the employment of prisoners in the manufacture, or production of such articles, or products as may be needed for the construction, operation, maintenance or use of any office, department, institution or agency supported in whole or in part by a state or its political subdivisions or for sale to the public." Ariz.Rev.Stat.Ann. Sec. 41-1622 (1989).
 
 
 29
 The stated purposes of correctional industries established pursuant to section 41-1622 are to:
 
 
 30
 "1. Make available within the state correctional institution opportunities for employment of inmates in jobs which combat idleness or develop good working habits.
 
 
 31
 2. Provide training and work experience that will assist inmates in eventually securing and holding gainful employment outside the correctional institution.
 
 
 32
 3. Reduce the cost to society of maintaining an inmate through the sale of inmate products and services and by requiring and enabling inmates to pay some portion of their room and board costs.
 
 
 33
 4. Require and enable inmates to make restitution to the victims of their offenses, so as to assist the inmates in accepting responsibility for the consequences of their acts.
 
 
 34
 5. Require and enable inmates to provide assistance to their dependents, thus tending to strengthen family ties.
 
 
 35
 6. Require and enable the inmate to accumulate savings for his eventual return to the community."
 
 
 36
 Ariz.Rev.Stat.Ann. Sec. 41-1622 (1989) (historical note) (quoting 1978 Ariz.Sess.Laws, Ch. 164, Sec. 29) (emphasis added).
 
 
 37
 The relevant law goes on to provide "compensat[ion] [to] prisoners for their services," Ariz.Rev.Stat.Ann. Sec. 41-1624.01(A) (1989), but it does so by specifying that all monies derived from contract services from either private or public sources are to be placed in a "specially designated revolving fund" that is then used in part to compensate prisoners. Ariz.Rev.Stat.Ann. Sec. 41-1624(B) (1989). The law establishing the revolving fund explicitly states: "No state appropriated funds may be utilized for payment of prisoner wages or benefits." Ariz.Rev.Stat.Ann. Sec. 41-1624(A)(2) (1989). Arizona has the right and the power to force prisoners to work. It also has the right to compensate working prisoners for their labor. I suppose also that it could adopt the FLSA, but it has not done so.
 
 
 38
 Given this arrangement, and given Arizona's Criminal Code's stated public policy of imposing "just and deserved punishment" on those convicted of crime, Ariz.Rev.Stat.Ann. Sec. 13-101 (1989), it thus comes as no surprise that Arizona law explicitly rejects the idea that prisoners are employees of the state.
 
 
 39
 In summary, when the economic reality of the relationship in this case together with Arizona's view of prisoners vis-a-vis their prison labor situation are viewed in the light of the express purpose of the FLSA, i.e., to provide for workers "a minimum standard of living necessary for health, efficiency and [their] general well-being ..." 29 U.S.C. Sec. 202 (1988), the conclusion that the FLSA does not apply to the prisoners in this case becomes readily apparent. I now come to Cutter Biological's relationship with these prisoners. Considering the factors listed in Bonnette, appellants did not raise a triable issue of fact here either. Under its contract with the Department of Corrections, Cutter did not have the power to hire or fire the inmate workers. Although it supervised the inmates in their daily activities, the state held the ultimate supervisory authority. The contract provided that the Department of Corrections had the authority to approve inmate assignments, and the responsibility to determine the rate and method of payment. Finally, appellants did not controvert the appellees' affidavits showing that Cutter Biological did not keep employment records for the inmates. The economic reality, therefore, is that Cutter Biological was not appellants' employer.
 
 
 40
 Thus, appellants have not raised a triable issue of fact under the economic reality test as to the existence of an employment relationship with either Cutter Biological or the State of Arizona, or for that matter with both of them if viewed in this venture as operating jointly.
 
 III
 The State Law Claims
 
 41
 The district court found it was without subject matter jurisdiction to entertain appellants' state law claims. Appellants' state law claims arise out of Ariz.Rev.Stat.Ann. Sec. 41-1624.01, which requires the Director to compensate prisoners for their services pursuant to Ariz.Rev.Stat.Ann. Sec. 31-254. That section provides, in pertinent part:
 
 
 42
 A. Each prisoner who is engaged in productive work in any state prison or institution under the jurisdiction of the department of corrections as a part of the prison industries program shall receive for his work such compensation as the director of the department of corrections shall determine. Such compensation shall be in accordance with a graduated schedule based on quantity and quality of work performed and skill required for its performance, but in no event shall such compensation exceed fifty cents per hour unless the prisoner is employed in an ARCOR enterprise pursuant to title 41, chapter 11, article 3. If the director enters into a contract pursuant to Sec. 41-1624.01 with a private person, firm, corporation or association the compensation shall be as prescribed by the person, firm, corporation or association but shall not be below the minimum wage.
 
 
 43
 Id. (footnote omitted).
 
 
 44
 Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), held that the Eleventh Amendment deprives federal courts jurisdiction to order state actors to comply with state law. As the Court stated, "[i]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." 465 U.S. at 106, 104 S.Ct. at 911. Thus, the district court correctly dismissed the state law claims.
 
 IV
 The Section 1983 Claim
 
 45
 To survive summary judgment in their section 1983 claim, appellants must have a property right to wages from their work at the plasma center and the parties sued must not be protected by the Eleventh Amendment and must qualify as persons under section 1983.
 
 
 46
 Appellants argue that they have a property right to wages because they meet the requirement of Arizona law for receiving minimum wages. In Piatt v. MacDougall, 773 F.2d 1032 (9th Cir.1985), this circuit recognized this property interest. The court held that if a prisoner meets the requirements of an Arizona statute mandating wages for prisoners who perform work for private parties, then the state cannot deprive the prisoner of this property interest without due process of law. Id. at 1036.
 
 
 47
 Along with a property interest, appellants must show that section 1983 provides a federal forum against the named defendants. Appellant's section 1983 action was filed against state officials, the Department of Corrections and the state of Arizona. The district court correctly dismissed the section 1983 action against the state of Arizona because a state is not a "person" for purposes of section 1983. Will v. Department of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2308, 105 L.Ed.2d 45 (1989). Likewise "arms of the State" such as the Arizona Department of Corrections are not "persons" under section 1983. Id. at 70, 109 S.Ct. at 2311; Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).
 
 
 48
 We also affirm the district court's decision that it had jurisdiction to award prospective relief under section 1983 against the state officials in their official capacities. See Quern v. Jordan, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); Edelman v. Jordan, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974).
 
 CONCLUSION
 
 49
 We find that the Eleventh Amendment is not a bar to the FLSA action. We hold, however, that state prisoners are not employees of the state or Cutter Biological. We also hold that the district court is without jurisdiction to order state officials to comply with state law, and that appellants' remedy for the section 1983 action may be limited to prospective injunctive relief. The district court's judgment is
 
 
 50
 AFFIRMED.
 
 
 51
 RYMER, Circuit Judge, concurring in part and concurring in the judgment:
 
 
 52
 I concur in all but Part II-B of Judge Trott's opinion, and I agree that the district court correctly granted summary judgment because on the record in this case, neither Cutter Biological nor the Arizona Department of Corrections is an employer for purposes of the Fair Labor Standards Act, 29 U.S.C. Sec. 201 et seq. I write separately to state my reasons for concluding that the inmate assistants are not covered by the FLSA.
 
 
 53
 The material facts are undisputed. Inmates at the Arizona State Prison at Florence, Arizona worked in various capacities at a Plasma Center located at the institution and operated by Cutter pursuant to contracts between Cutter and the Director of the Department of Corrections. Under these contracts the Department of Corrections assigned prisoners to Cutter as assistants to Cutter staff. Approval and assignment of workers was at the Department's discretion. The Plasma Center paid the Department of Corrections twelve dollars per week for each prisoner who worked there. All compensation for prisoner services at the Center was paid directly to the Inmates Account Office, which in turn used the funds to pay the inmate laborers. There were no agreements between the Plasma Center and any prisoner regarding compensation or conditions of employment. Routine, day-to-day supervision of the inmate assistants at the Center was by Cutter. While Cutter from time to time made work assignments and suggested removals, there is no evidence that it could trump prison authorities in terms of hiring or firing, rate of pay, or time of work. Cutter maintained no employment records other than a list of names of prisoner assistants.
 
 
 54
 The parties dispute only whether these facts make Cutter or the Department an "employer" within the meaning of the FLSA. That question is a legal issue. Bonnette v. California Health and Welfare Agency, 704 F.2d 1465, 1469 (9th Cir.1983); see Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961).
 
 
 55
 In resolving it, we are obliged to apply the "economic realities" test.[1] Bonnette, 704 F.2d at 1470. That test requires that we consider the totality of the circumstances, including whether the alleged employer had the power to hire and fire employees, supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment and maintained employment records. Id.
 
 
 56
 In this case we must determine whether either the institution or Cutter, an outside entity, is an "employer" for FLSA purposes. That inquiry, in turn, impels us to recognize that two or more employers may jointly employ someone for purposes of the FLSA. Id. at 1469. Unlike the dissent, however, I do not believe that either the institution or Cutter passes the threshold question of whether it, alone, is an "employer."[2]
 
 
 57
 Bonnette is the seminal opinion in this circuit. A county social worker determined a recipient's financial eligibility and need for chore worker services, the tasks to be performed and the hours per week required to perform the task; the recipient "bought" the chore worker services with money provided by the county and was responsible for hiring, firing and supervising. Under those circumstances we held that the fact that the county delegated various responsibilities to recipients did not alter the county's complete economic control and the "economic reality" that the county employed chore workers to perform social services for the benefit of recipients; rather, it made them joint employers. Put another way, an "employer" under the FLSA may not shield itself from responsibility under the Act on the ground that another person or entity exercises some control over the employee. Yet neither Bonnette nor any case following it is authority for finding that two entities, neither of whom is an "employer" under the Act, may nevertheless jointly be an "employer" because together they have sufficient control over the nature and structure of the employment relationship.
 
 
 58
 The statutory scheme is consistent with this interpretation because it assumes that at least one of the allegedly joint employers is an "employer" under the Act. Section 203(d) provides that an " '[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee...." 29 U.S.C. Sec. 203(d), while an " 'employee' means any individual employed by an employer." 29 U.S.C. Sec. 203(e)(1). Further, under the regulations, all of the employee's work for all of the joint employers is considered as one employment and all joint employers are responsible, both individually and jointly, for compliance. 29 C.F.R. Sec. 791.2(a) (1990). Thus, while there may be more than one "employer" of an "employee" covered by the Act, Falk v. Brennan, 414 U.S. 190, 195, 94 S.Ct. 427, 431, 38 L.Ed.2d 406 (1973); Bonnette, 704 F.2d at 1469, either the Department of Corrections or Cutter or both must meet the statutory definition.
 
 
 59
 Prisoners cite no authority for holding a Department of Corrections and an outside employer to be joint employers in the context of inmate labor. No reason occurs for us to be the first to so hold on the record in this case.[3]
 
 
 60
 In this case, neither alleged "employer" possesses, on its own, the characteristics of an employer. It is undisputed that the contract which governed the employment relationship is between Cutter and the state. It vests the power to hire and fire solely with the state. The Department of Corrections had ultimate responsibility for assigning and approving inmates for work in the Cutter lab. The rate and method of pay was within the exclusive province of the DOC; inmates who work at the Plasma Center are paid by the Department, not by Cutter. Work was performed in the prison, not outside. There is no evidence that Cutter kept employment records for the inmate prisoners, proposed the arrangement, invited inmates to participate, suggested the wage, decided who could work how much, or had criteria for Center assistants. Cf. Carter v. Dutchess Community College, 735 F.2d 8, 15 (2d Cir.1984) (outside entity had made initial proposal to "employ" inmate workers; suggested wage; developed eligibility criteria; recommended inmates for the positions; was not required to take any inmate it did not want; decided how many sessions and for how long an inmate would be permitted to tutor; and sent compensation directly to inmate's prison account).[4]
 
 
 61
 Prison officials paid inmate laborers, controlled how much they were paid and how payments were made, determined which inmates could work in the lab (albeit sometimes in consultation with Cutter) and for how long, and had responsibility for discipline. There is no evidence that the DOC had a pecuniary, rather than penological, interest in inmate labor.
 
 
 62
 Considering all these facts, the district court did not err in concluding that Cutter was not an employer for purposes of the FLSA. Unlike Carter, where the plaintiff was an inmate in the Fishkill Correctional Facility and was employed outside of the prison as a teaching assistant at Dutchess Community College, and Watson v. Graves, 909 F.2d 1549 (5th Cir.1990), where the plaintiff was on a work release program outside the jail, and the courts found triable issues regarding FLSA coverage, in this case the inmates were assigned to the Cutter lab inside the institution, like other cases which have found no employer-employee relationship. See, e.g., Alexander v. Sara, Inc., 559 F.Supp. 42, 43-44 (M.D.La.), aff'd per curiam, 721 F.2d 149 (5th Cir.1983) (no contractual relationship between inmates and outside company; compensation paid to State, not to inmates; no right on part of outside company to reject inmate assigned to work in plasma program); Sims v. Parke Davis & Co., 334 F.Supp. 774, 783-87 (E.D.Mich.), aff'd per curiam, 453 F.2d 1259 (6th Cir.1971), cert. denied, 405 U.S. 978, 92 S.Ct. 1196, 31 L.Ed.2d 254 (1972) (no contractual relationship between inmates and outside company; outside company relinquished to prison officials normal rights of employer to determine manpower needs, who workers would be and to discharge unsatisfactory workers); Hudgins v. Hart, 323 F.Supp. 898, 899 (E.D.La.1971) (no contractual relationship between outside company and inmates; prison officials assigned inmates to work; money was sent to prison, which decided how much to pay); Huntley v. Gunn Furniture Co., 79 F.Supp. 110, 111-13 (W.D.Mich.1948) (sole control in prison).
 
 
 63
 Nor did it err in concluding that the Department of Corrections was not an employer. Even though our decision in Baker v. McNeil Island Corrections Center, 859 F.2d 124 (9th Cir.1988) forecloses a holding that as a matter of law a prison may never be an "employer" of an inmate laborer,[5] it does not define what constitutes such a relationship and has nothing pertinent to say about the showing required for coverage of a prison inmate under the FLSA. Rather, we must decide the issue case by case.
 
 
 64
 The facts in this case show that inmate labor belongs to the institution. That being so, there is no need to protect "the standard of living and general well-being of the worker in American industry." Alexander, 721 F.2d at 150. As put by the Fifth Circuit in Watson, "[n]either is there fear of 'upsetting the desired equilibrium in the work place,' because the 'work place' was the prison itself. See Carter, 735 F.2d at 13. From that fact alone it is evident there was no unfair competition among workers in job markets outside the prison." 909 F.2d at 1555. The inmate assistants were not on a work release program, did not work off premises and were not free not to work. The relationship between prison and prisoner was entirely custodial, bearing none of the indicia of a traditional employment relationship such as the exercise of discretion and exchange of wages for labor. No other court has found that an employer-employee relationship exists under these circumstances[6] and I believe the district court correctly determined that no such relationship exists in this case.
 
 
 65
 D.W. NELSON, Circuit Judge, dissenting.
 
 
 66
 The practical question before us is whether inmates assigned to work at a plasma center operated by a private enterprise are covered by the Federal Labor Standards Act (FLSA). The majority finds that appellants are not in an employer/employee relationship under the FLSA with either the state or Cutter Biological. En route to this conclusion, it overlooks Supreme Court guidance and, I believe, misconstrues Congressional purpose. In my view, this court's decision should reflect the central aims of federal legislation. Because I cannot subscribe to the majority's niggardly interpretation of the FLSA, I must respectfully dissent.
 
 
 67
 The majority correctly outlines the factors to be considered in examining the "economic reality" of the employment situation for the purposes of the FLSA. This test looks to four factors: whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Bonnette v. California Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir.1983). After discussing the guidelines, however, the majority then fails to apply them correctly to the facts of this case.
 
 
 68
 The reasons for this failure are hard to decipher. On the one hand, Judge Trott apparently holds that "the FLSA itself cannot be said to cover prison labor." Supra at 1325. On the other hand, he goes on to apply the four-part economic realities test and finds that under the facts of this case, these appellants are neither Cutter's nor the state's employees. Id. at 1325-1326.[1] While I am not certain which of these is my colleague's position, I am confident that both are equally wrong. For her part, Judge Rymer chooses in her concurrence to avoid the first question in its entirety, focusing instead on the Bonnette factors. See supra at n. 1. However, the economic realities test cannot be considered in a vacuum. It must be conducted, throughout, with an eye to the overriding legislative purpose.I. Congressional Purpose
 
 
 69
 Context in this case means the reasons for the FLSA's enactment by Congress. I agree with Judge Trott that the Act's express purpose was to aid the unprotected and lowest paid of the working people. See supra at 1326. Also I understand, though I do not fully share, my colleague's distaste at extending Congress' economic protection to people he labels "convicted murderers, rapists, burglars, armed robbers, swindlers, thieves, and the likes." See supra at 1324. But that is to miss the point. For to conclude that the FLSA applies in this case requires no particular sympathy for prison inmates.
 
 
 70
 In section 202(a) of the Act, Congress indicated that
 
 
 71
 the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; ... [and] (3) constitutes an unfair method of competition in commerce.
 
 
 72
 29 U.S.C. Sec. 202(a). Lest it had not been clear enough, the House also explained in a Report that, in the wake of the Act's passage,
 
 
 73
 [n]o employer in any part of the United States in any industry affecting interstate commerce need fear that he will be required by law to observe wages ... higher than those applicable to his competitors. No employee ... need fear that the fair labor standards maintained by his employer will be jeopardized by oppressive labor standards maintained by those with whom his employer competes.
 
 
 74
 H.R.Rep. No. 2182, 75th Cong., 3d Sess. 6-7 (1938); see also International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 808 (D.C.Cir.1983).
 
 
 75
 The FLSA, in other words, is comprehensive legislation. It certainly is designed to directly assist exploited employees requesting its enforcement in a specific instance. But its sword is double-edged. It also purports to come to the indirect aid of compliant employers and their employees who might suffer from the ill effects of nonobservance. See Watson v. Graves, 909 F.2d 1549, 1554 (5th Cir.1990) ("The Act was drafted ... to eliminate unfair competition among employers competing for business in the market and among workers looking for jobs") (citing Carter v. Dutchess Comm. College, 735 F.2d 8, 14 (2d Cir.1984)); International Ladies' Garment Union, 722 F.2d at 808-09; see also Lerwill v. Inflight Services, Inc., 379 F.Supp. 690, 696 (N.D.Cal.1974) (enforcement of the Act "is also intended to protect the employers who comply with its terms"), aff'd sub nom. Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507 (9th Cir.1978).
 
 
 76
 Put somewhat differently, the scope of the FLSA must be broad enough to prevent companies engaged in interstate commerce from taking advantage of employees' substandard wages. See United States v. Darby, 312 U.S. 100, 109-10, 115, 61 S.Ct. 451, 454-55, 457, 85 L.Ed. 609 (1941). In general, whether it applies thus depends on whether application will further this goal.[2]
 
 
 77
 Neither one of my colleagues addresses the unfair competition issue. Indeed, Judge Rymer dismisses it in a footnote, on the ground that no relevant evidence has been presented. See supra at n. 4 (Rymer, J., concurring). It is true that appellants in this case are not Cutter's competitors; their interest is in receiving a minimum wage, not in purifying the stream of commerce. But I remain convinced that Congress' overall intent must determine the Act's applicability to a specific case. See, e.g., Carter, 735 F.2d at 14.
 
 
 78
 In most cases, both concerns overlap: the persons seeking application of the FLSA are precisely those Congress wished to assist, and, in so doing, Congress protects compliant employers and their employees as well. Here, however, we have a slightly different scenario: Congress, arguably, is indifferent to the economic well-being of prisoners. But it remains concerned, and so, by implication, must we, with the effect of their working conditions on other employers and their employees. In such cases, I believe, the principles underlying the FLSA must guide our determination regarding the Act's coverage.
 
 
 79
 With this in mind, I now turn to the second question, namely whether, and in what circumstances, the FLSA extends to prison labor.
 
 
 80
 II. Application of the FLSA to Prison Inmates
 
 
 81
 If Judge Trott's view is that prison labor can never be covered by the FLSA, it is at odds with precedent both from the Supreme Court and from this Circuit. First, such a narrow interpretation of an employment relationship disregards over forty years of Supreme Court case law requiring the courts to define "employer" and "employee" expansively under the Act. See, e.g., Tony & Susan Alamo Found. v. Secretary of Labor, 471 U.S. 290, 295-96, 105 S.Ct. 1953, 1958-59, 85 L.Ed.2d 278 (1985); Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 32, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961); Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 1476, 91 L.Ed. 1772 (1947); Walling v. Portland Terminal Co., 330 U.S. 148, 150-51, 67 S.Ct. 639, 640-41, 91 L.Ed. 809 (1947); United States v. Rosenwasser, 323 U.S. 360, 362-63, 65 S.Ct. 295, 296-97, 89 L.Ed. 301 (1945).[3]
 
 
 82
 Second, this position is hard to square with what we have said on this issue up to now. In Baker v. McNeil Island Corrections Center, 859 F.2d 124 (9th Cir.1988), a prison inmate brought a Title VII suit against the prison. The district court, finding that there was no employment relationship between a prison and its prisoners, dismissed the suit for failure to state a claim. We reversed, rejecting the claim that as a matter of law prisoners cannot be employees of the state.[4] The Second Circuit, in Carter v. Dutchess Community College, 735 F.2d 8, 13-14 (2d Cir.1984), and the Fifth Circuit, in Watson v. Graves, 909 F.2d 1549, 1554 (5th Cir.1990) (agreeing "with the Carter court that status as an inmate does not foreclose inquiry into FLSA coverage"), reached the same conclusion.
 
 
 83
 I suspect that Judge Trott's result derives in large part from his fragmentary interpretation of the FLSA's purpose. By focusing exclusively on the fact that the FLSA was enacted to improve workers' living conditions, he can then easily conclude that prisoners were not meant to fall within the statute's protective reach. But in his haste to deny economic benefits to inmates, he has lost sight of the second major rationale behind the FLSA's minimum wage provisions. As I discussed earlier, Congress intended the FLSA to have the widest possible impact in the national economy because one of its purposes was the establishment of minimum standards in the workplace in order to eliminate unfair competition among private companies and among workers looking for jobs. See Mitchell v. Robert De Mario Jewelry Inc., 361 U.S. 288, 292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960); Carter 735 F.2d at 13. This national purpose is subverted when a court permits one company within an industry to avoid the strictures of the Act. By exempting appellants from FLSA coverage, the majority, without even discussing this issue, has given Cutter Biological an unfair cost advantage over its competitors, who are required to pay minimum wage. Quite simply, Cutter, with the state's assistance, is making use of a cheap labor pool, bypassing the Act's constraints, and thwarting its overriding purpose.
 
 
 84
 I cannot believe that Congress intended to create a loophole of such proportions, permitting employers to hire labor at substandard pay and then sending the output into the flow of commerce. Indeed there are, as Judge Trott remarks, "obvious policy considerations" to this issue, supra at 1324--but they are triggered by nonenforcement rather than by enforcement of the Act.
 
 
 85
 The majority's recitation of Arizona's law regarding prisoners, or of the purposes of correctional industries, supra at 1325, is irrelevant in this regard. What matters is that Cutter was offered a pool of workers whose wages were below the legal minimum; what matters is that one for-profit business thereby enjoyed an unfair advantage over its competitors. Moreover, the inmates worked alongside Cutter's other, "regular" employees performing essentially the same job. The relevance of these factors becomes clearer when we consider the hypothetical case of a prison requiring its inmates to perform prison maintenance work or produce goods used solely by the state for less-than-minimum wages. In this situation, the FLSA's concern about economic fairness in a competitive market does not come into play; in ours, it must.[5]
 
 
 86
 As an aside, it also is worth reminding that, under Ariz.Rev.Stat.Ann. Sec. 41-1624, the Department can use part of the prisoners' wages for purposes other than compensation. Possible uses might conceivably include payment for room and board, support for prisoners' families, or various operating expenses. In short, the issue is not one of unjustified reward to a state prisoner, but of unwarranted benefit to a private enterprise.
 
 
 87
 Having concluded that, under the specific circumstances of this case, Arizona's inmates fall under the FLSA's umbrella, we arrive at the final hurdle: Are appellants employees of Cutter and the state?
 
 III. The Bonnette Test
 
 88
 The minimum wage provisions apply only if appellees are "employers" of the inmates within the meaning of the FLSA. As the majority explains, the status is commonly determined by the Bonnette test, described above. See supra at 1328 (Rymer, J., concurring). At the outset, however, it bears repeating that mere technical adherence to the test cannot suffice. For it is the economic realities of the situation we are interested in, and they must be analyzed "in light of the policies behind the FLSA." Watson, 909 F.2d at 1555. My colleagues may well have scrupulously embarked on the four-part test, but they have left its substance behind.
 
 A. The State's Relationship With Appellants
 
 89
 Under the proper analysis of "economic reality" using the framework of Bonnette, the state qualifies as an employer. See Goldberg, 366 U.S. at 32-33, 81 S.Ct. at 936-937; Rutherford, 331 U.S. at 730, 67 S.Ct. at 1476; Bonnette, 704 F.2d at 1469-70; Carter, 735 F.2d at 12. The state Department of Corrections (DOC) determined which inmates could be employed and retained the power to remove an inmate from his job. Although not directly supervising during the employment day, the state maintained control over the inmates for security purposes. The method of payment was agreed to by the DOC in contract negotiations with Cutter Biological and the DOC determined the pay scale.[6]
 
 
 90
 Most disturbing to the majority, apparently, is the state's degree of control. Specifically, its complete control over the prisoners would preclude it from being an employer because this control was not part of the "bargained for exchange of labor" that occurs in traditional employer/employee relationships. This analysis contradicts Ninth Circuit and Supreme Court case law.
 
 
 91
 In Baker, the court found that the most important factor in determining whether an employment relationship exists is "the extent of the employer's right to control the means and manner of the worker's performance." Id. at 128. Contrary to the majority's analysis, the court in Baker held that the prison's complete control of its inmates made more certain the inmates' status as employees of the institution. Id. The analysis in Baker precludes the majority from deciding that these prisoners cannot be employees of the state based on the state's control.
 
 
 92
 Neither can the court depend on traditional common law notions of "bargained for exchange" to determine what is an employer/employee relationship for FLSA purposes. "The definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." Bonnette, 704 F.2d at 1469; accord Rutherford, 331 U.S. at 729, 67 S.Ct. at 1476; Real v. Driscoll Strawberry Assoc., 603 F.2d 748, 754 (9th Cir.1979). The majority is required to determine whether an employment relationship exists based on the guidelines and analysis outlined in FLSA precedent; it errs in relying on a narrow traditional notion of the concept of employer that completely misinterprets the import of control in an employer/employee relationship.
 
 
 93
 In reality, there is nothing inconsistent in the coexistence of prisoner and employee status under the FLSA. If inmates are selected to work for private contractors participating in the market at large, they are in that capacity and given the FLSA's purpose, "employees" of the state within the conception of the Act.
 
 
 94
 B. Cutter Biological's Relationship with Appellants
 
 
 95
 In considering this relationship, the majority disregards facts and does not view the evidence in the light most favorable to appellants, as is required when reviewing a motion for summary judgment. See Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989). A close examination of the facts reveals that the inmates' employment with Cutter Biological satisfies the Bonnette factors. I will outline briefly the facts that apply to each factor.
 
 
 96
 (i) The power to hire and fire employees.
 
 
 97
 As the majority states, it is undisputed that the DOC determined whether a prisoner was eligible to work and could remove him from the job. However, the record indicates that an inmate had to be interviewed and selected by Cutter Biological and could be removed if Cutter Biological did not approve of the prisoner's work. The number and qualifications of the workers also were decided by Cutter Biological, and once a prisoner had been hired, Cutter Biological could promote or demote him on the basis of his performance. Cutter Biological has never alleged that it was required to employ a prisoner it did not desire. It is true that prisoners discontinued their employment when Cutter Biological did not wish them to leave, but even private employers involuntarily lose personnel.
 
 
 98
 In sum, although Cutter Biological was limited to employing only those selected by the DOC, once an inmate was eligible, Cutter Biological had the power to hire and fire. It would "run counter to the breadth of the statute and to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over work, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the Act." Carter, 735 F.2d at 12.
 
 
 99
 (ii) Supervision and control of employee work schedules and conditions.
 
 
 100
 Cutter Biological had nearly the same supervision and control over employee work schedules and conditions as a private employer. The prisoners were only available to work during certain hours and sometimes due to prison business they missed a day of work; this also is true of private employment situations. The details of the prisoners' work assignments were jointly specified by Cutter Biological and the DOC. Cutter Biological completely determined the working conditions of the prisoners--what tasks each prisoner performed, how much the prisoner was paid within the DOC range (depending on which job he held), and whether the prisoner was promoted. As Judge Trott admitted, Cutter Biological "supervised the inmates in their daily activities." This supervision qualifies Cutter Biological as an employer under the second Bonnette factor.
 
 
 101
 (iii) Rate and method of payment.
 
 
 102
 It appears that the pay scale was determined by the DOC. However, within that range Cutter Biological determined which prisoners were paid which rate. Prisoners were paid more if they had more responsibility and Cutter Biological had complete discretion over which prisoners held the more lucrative jobs. The method of payment was determined by contract between Cutter Biological and the DOC and by state law. Cutter Biological, then, had some control over the rate and method of payment through its contract negotiations with the DOC.
 
 
 103
 (iv) Employment records.
 
 
 104
 The majority claims that Cutter Biological kept no employment records. It is unclear what they mean by employment records. The record contains Cutter Biological's contemporaneous reports on how much each inmate worked and how much each was paid. I would consider those to be employment records.
 
 
 105
 In short, and after examining the "circumstance of the whole activity," it is clear that the relationship between Cutter Biological and the prisoners could be nothing else but employer/employee. The inmates were not independent contractors; Cutter Biological had no rehabilitative or custodial relationship with them. It is undisputed that the prisoners performed precisely the same job that civilian employees performed for Cutter Biological. The prisoners worked for Cutter Biological and Cutter Biological permitted them to work because it profited from doing so. We are required to interpret the definition of employer expansively; under that mandate Cutter Biological must be an employer.
 
 
 106
 We are left, then, with the argument that responsibilities were divided between the state and Cutter Biological. In essence, the majority argues that the state's control over appellants precludes Cutter from being an employer because it deprives the private company of one of the essential attributes of that status. The Labor Department has prevented this absurd consequence by adopting the concept of joint employment. Two parties are joint employers if they share or co-determine those matters governing the essential terms and conditions of employment. NLRB v. Greyhound Corp., 368 F.2d 778, 780 (5th Cir.1966), on remand from Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). As we observed in Bonnette, 704 F.2d at 1470: "The fact that the appellants delegated to the recipients various responsibilities does not alter [the economic reality]; it merely makes them joint employers." Likewise, dividing the responsibilities of employment between the state and Cutter biological does not mean that neither is the employer; it means that they are joint employers. See Bonnette, 704 F.2d at 1469-70; NLRB v. Browning-Ferris Indus., 691 F.2d 1117, 1122-23 (3d Cir.1982); NLRB v. Checker Cab Co., 367 F.2d 692, 698 (6th Cir.1966)), cert. denied, 385 U.S. 1008, 87 S.Ct. 715, 17 L.Ed.2d 546 (1967).[7]
 
 
 107
 The majority's error, in sum, is in finding that because Cutter Biological shared control over the worker it could not be the employer. In reality, the fact that Cutter Biological's control was qualified does not place its employment relationship beyond the scope of the FLSA; it makes Cutter Biological a joint employer.
 
 
 108
 A useful analogy is provided by the independent contractor situation. In such cases, typically, a company will contract with someone who is responsible for finding workers and then supervising them. Although the company might not exercise control over basic components of its relationship with the workers, courts have not hesitated to find employment status. See, e.g., Castillo v. Givens, 704 F.2d 181, 190 (5th Cir.1983) (finding that such status could exist "even though the defendant-employer had no control over ... the right to set hours, hire and fire, or determine wages"); Usery v. Pilgrim Equipment Co., Inc., 527 F.2d 1308, 1312 (5th Cir.), cert. denied, 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976). Where, as here, the party sharing control also is an employer, they become joint employers. Cf. Castillo, 704 F.2d at 188.
 
 IV. Conclusion
 
 109
 The crux of this case is simply this: Given the purposes of the FLSA, were appellants in an employer/employee relationship with the state and Cutter Biological? The majority starts off on the wrong foot by failing to discuss these purposes in full. It then errs by focusing on "isolated factors" rather than "upon the circumstances of the whole activity." Rutherford, 331 U.S. at 730, 67 S.Ct. at 1477. In my view, however, this is the type of situation that the legislation was intended to govern, and these prisoners could be nothing else but employees.
 
 
 110
 The "economic reality" of the situation is that the inmates in this case were employed by a private company to produce a product for interstate commerce. The reality is that inmates "are not self-employed; nor are they independent, selling their products on the market for whatever price they can command. They are regimented under one organization, manufacturing what the organization desires, and receiving the compensation the organization dictates." Goldberg, 366 U.S. at 32, 81 S.Ct. at 936 (footnote omitted). Likewise, there is no doubt that together the state and Cutter Biological have the power to hire and fire, supervise and control work schedules and conditions, determine the rate and method of payment and maintain employment records. The critical question is one that the majority neither asks nor answers: if this is not an employment relationship, what is it?
 
 
 111
 The majority's cramped analysis under the FLSA allows a few select private companies within an industry to gain an unfair competitive advantage by circumventing minimum wage laws. Because I believe this was not Congress' intention, I respectfully dissent.
 
 
 
 [1]
 The plasma center has been closed since September of 1987
 
 
 [2]
 Other courts in prisoner cases have also looked to these factors in determining whether an employment relationship exists. See Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir.1984); Alexander v. Sara, Inc., 559 F.Supp. 42, 43-44 (M.D.La.), aff'd, 721 F.2d 149 (5th Cir.1983); Sims v. Parke Davis & Co., 334 F.Supp. 774, 787 (E.D.Mich.), aff'd, 453 F.2d 1259 (6th Cir.1971), cert. denied, 405 U.S. 978, 92 S.Ct. 1196, 31 L.Ed.2d 254 (1972); Hudgins v. Hart, 323 F.Supp. 898, 899 (E.D.La.1971)
 
 
 [3]
 Carter, 735 F.2d at 13 (discussing 29 U.S.C. Sec. 213 (1982))
 
 
 [4]
 We find distinguishable and thus inapplicable Baker v. McNeil Island Corrections Center, 859 F.2d 124 (9th Cir.1988), which deals with Title VII discrimination. It does not cover an economic relationship, and it does not discuss the FLSA
 
 
 [1]
 While I agree with Judge Trott that it is tough to imagine that the Congress contemplated minimum wage levels for inmates, I respectfully disagree that it is necessary to reach this issue in this case. Also, to reach and resolve the question as he appears to would put us in conflict with the Second Circuit, which, in Carter v. Dutchess Community College, 735 F.2d 8, 13 (2d Cir.1984), considered and rejected the argument that Congress intended to exclude the category of prisoners from FLSA coverage. See also Watson v. Graves, 909 F.2d 1549, 1554 (5th Cir.1990) (status as an inmate does not foreclose inquiry into FLSA coverage). Because we are to avoid creating intercircuit conflict when possible, United States v. Gwaltney, 790 F.2d 1378, 1388 n. 4 (9th Cir.1986), cert. denied, 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987), I write separately
 
 
 [2]
 The dissent's discussion of the joint employer doctrine appears to be premised on its conclusion that both Cutter and the state are employers. Because I believe there is no "employer" in this case, I would not reach the issue of joint employment
 To the extent the dissent assumes that characteristics of the prison should be aggregated with characteristics of Cutter so that together, or separately, they constitute an "employer," I disagree. In this case, no one argues that the prison and Cutter, together, form a single legal entity. If the relationship between Cutter and the prison gave rise to some cognizable legal entity, such as a partnership or joint venture, then the characteristics of each could be aggregated to show that that single entity was an "employer." See NLRB v. Browning-Ferris Indus., 691 F.2d 1117, 1122 (3d Cir.1982) (NLRB case). The question of whether the prison and Cutter form some sort of new entity is not before us, however. Unless either the prison, alone, or Cutter, alone, is an "employer," then the inmate assistants are not covered by the FLSA.
 
 
 [3]
 The cases upon which the dissent relies for the proposition that two parties are joint employers if they share or co-determine those matters governing the essential terms and conditions of employment, NLRB v. Browning-Ferris Indus., 691 F.2d 1117, 1122-23 (3d Cir.1982); NLRB v. Greyhound Corp., 368 F.2d 778, 780 (5th Cir.1966); NLRB v. Checker Cab Co., 367 F.2d 692, 698 (6th Cir.1966), cert. denied, 385 U.S. 1008, 87 S.Ct. 715, 17 L.Ed.2d 546 (1967), arise under a different statute and concern whether one or more ostensibly separate entities is a "single employer" or "joint employer" for purposes of complying with the National Labor Relations Act. They are consistent with the point that some one entity must be an "employer" and add nothing to the analysis. Nor do independent contractor cases such as Castillo v. Givens, 704 F.2d 181 (5th Cir.1983), and Usery v. Pilgrim Equipment Co., 527 F.2d 1308 (5th Cir.), cert. denied, 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976), provide a useful analogy. In those cases, the defendants, alleged employers, claimed that third parties who hired and fired workers and paid wages to them had sufficient control over them to be independent contractors, such that the workers were not the defendants' employees. They are not joint employer cases, see Castillo, 704 F.2d at 188, and their rationale--that statutory coverage exists for those who are dependent upon the business to which they render service for their livelihood--is inapplicable to the prisoner labor at issue in this case
 
 
 [4]
 There also is no evidence that the Cutter Plasma Center caused unfair competition among employers competing for plasma business or among workers looking for jobs. Thus, even assuming these concerns are material when the inmate is confined to prison and has an obligation to work, they are not implicated in this case
 
 
 [5]
 For example, Baker left open the possibility that an inmate might be an employee of a prison for purposes of Title VII where the inmate has an option of whether or not to work. Here, however, Arizona law requires inmates to work; they have no choice
 
 
 [6]
 In Wentworth v. Solem, 548 F.2d 773 (8th Cir.1977) (per curiam) the court expressed doubt that Congress intended the FLSA to cover an inmate working in prison industries but its holding, that an inmate working in bookbinding was not an employee, was based on National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which has since been overturned. Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)
 
 
 [1]
 Adopting yet another alternative view, Judge Trott states that he finds "merit" to the argument that "the FLSA does not apply to prison inmates as a class," id. at 1324, seemingly expressing uncertainty about a position which he then proceeds to adopt wholesale
 
 
 [2]
 Of course, there are certain categories of people expressly excluded from the FSLA. But, as Judge Trott acknowledges, prisoners are not. See supra at 1325
 
 
 [3]
 In Alamo, the Court held that we must construe the FLSA "liberally to apply to the furthest reaches consistent with congressional direction," 471 U.S. at 296, 105 S.Ct. at 1959; in Rosenwasser, it stated:
 A broader or more comprehensive coverage of employees ... would be difficult to frame. The use of the words "each" and "any" to modify "employee," which in turn is defined to include "any" employed individual, leaves no doubt as to the Congressional intention to include all employees within the scope of the Act unless specifically excluded.
 323 U.S. at 362-63, 65 S.Ct. at 296-97. Finally, in Walling, the Court explained that the "Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships which, prior to the Act, were not deemed to fall within an employer-employee category." 330 U.S. at 150-51, 67 S.Ct. at 640-41.
 
 
 [4]
 Judge Trott's hurried dismissal of Baker as "inapplicable" is unconvincing. Although Baker was interpreting the definition of employer under Title VII rather than the FLSA, "cases construing the definitional provisions of [the FLSA, Title VII or the ADEA] are persuasive authorities when interpreting the others." Hyland v. New Haven Radiology Assocs., 794 F.2d 793, 796 (2d Cir.1986); accord Rutherford Food Corp. v. McComb, 331 U.S. 722, 723, 67 S.Ct. 1473, 1474, 91 L.Ed. 1772 (1947)
 In Baker, as here, we were faced with the argument that the prison's "relationship with [the inmate is one] of prison/prisoner only, because the work positions are part of an inmate's correctional programing." Baker, 859 F.2d at 126; see also supra at 1325-1326. The district court in Baker, like Judge Trott in this case, invoked the irresistible authority of "common sense" to defeat a differing point of view. Baker at 128 (noting that the district court had found "common sense differences ... between inmate work assignments and ordinary employment relationships"); supra at 1324 (reaching its conclusion "with an eye guided by common sense and common intelligence"). Common sense notwithstanding, it is very difficult, in my view, to read Baker without concluding that, in certain circumstances at least, an employment relationship can exist between a prison and its prisoners.
 
 
 [5]
 Although sharing my view that the FLSA is applicable to prison inmates, the Watson court distinguishes between inmates working outside the jail and inmates working for private companies "within the confines of the prison as a part of their sentence to hard labor." 909 F.2d at 1553-55. It goes on to explain that in the latter situation:
 there is no need to "protect the standard of living and general well-being of the worker in American industry." ... Neither is there fear of "upsetting the desired equilibrium in the work place," because the "work place" was the prison itself.
 Id. at 1555 (citations omitted).
 I confess that the court's logic escapes me. If the concern is with the impact of cheap labor on the economy, see id. at 1554-55, the pertinent distinction is between work performed, say, for prison maintenance and work performed for outside commerce. Whether the private company moves to the prison or the inmates migrate to the outside world is, from this perspective, irrelevant.
 
 
 [6]
 The record does not indicate whether the state kept employment records
 
 
 [7]
 "Two or more employers may jointly employ someone for purposes of the FLSA." Bonnette, 704 F.2d at 1469; accord Falk v. Brennan, 414 U.S. 190, 195, 94 S.Ct. 427, 431, 38 L.Ed.2d 406 (1973). An employee is employed jointly if "the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly...." 29 C.F.R. 791.2(b)(2) (1989). This determination of whether an entity possesses "sufficient indicia of control to be an 'employer' " is essentially a factual inquiry. Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S.Ct. 894, 899, 11 L.Ed.2d 849 (1964)