Felton HALE and Richard S. Berry,
Plaintiffs–Appellants,

v.

STATE OF ARIZONA; ARCOR Enterprises, a subdivision of the state; James Ricketts, former director of the Arizona Department of Corrections (DOC); Samuel Lewis, director of the DOC; Marilyn Wilkens, director of Arizona Correctional Industries; Thomas Lescault, director of ARCOR; Tony West, David Tierney, Earl Cobb, Thomas Donnelly, Henry Evans, Marcus Englemen, Delbert Householder, and Ray Shaffer, members of the Board of Directors, ARCOR Enterprises, Defendants–Appellees.

John Leroy FULLER, et al.,
Plaintiffs–Appellants,

v.

STATE OF ARIZONA; ARCOR Enterprises, a subdivision of the state; James Ricketts, former director of the Arizona Department of Corrections (DOC); Samuel Lewis, director of the DOC; Marilyn Wilkens, director of Arizona Correctional Industries; Thomas Lescault, director of ARCOR; Tony West, David Tierney, Earl Cobb, Thomas Donnelly, Henry Evans, Marcus Englemen, Delbert Householder, and Ray Shaffer, members of the Board of Directors, ARCOR Enterprises; Richard Orberg, ARCOR Vice President of Operations; Kenneth Van De Veer, ARCOR Vice President of Business and Finance; John F. Wright, former interim CEO, ARCOR; James Kinsella, former ARCOR Vice President of Business and Finance; Gilbert Evans, former ARCOR director of operations; Ralph Cluff, ARCOR operations and control officer; Michael Ullery, former interim ARCOR operations and control officer, Defendants–Appellees.

Nos. 88–15785, 89–15162.

United States Court of Appeals,
Ninth Circuit.

Argued En Banc and Submitted
Nov. 12, 1992.

Decided May 4, 1993.

Michael E. St. George, St. George and Reed, Tempe, AZ, for plaintiffs-appellants.

Anthony B. Ching, Sol. Gen., State of Ariz., Phoenix, AZ, for defendants-appellees.

Before: BROWNING, SCHROEDER, FLETCHER, ALARCON, POOLE, NORRIS, BRUNETTI, NOONAN, LEAVY, RYMER, and T.G. NELSON, Circuit Judges.

RYMER, Circuit Judge:

Felton Hale, John Leroy Fuller and other inmates in Arizona correctional facilities who have worked for state prison industries programs seek to be paid the federal minimum wage on the ground that they are "employees" of the prison under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201, et seq. They filed complaints against the State of Arizona, ARCOR Enterprises (ARCOR) and its successor Arizona Correctional Industries (ACI), and officials of the Arizona Department of Corrections (DOC), ARCOR, and ACI for damages and injunctive relief under the FLSA, 42 U.S.C. § 1983, and Arizona law. The district court in *Hale* granted summary judgment in favor of all defendants because it found no employer-employee relationship under the FLSA and no jurisdiction over state claims or retrospective federal claims because of the Eleventh Amendment. The district court in *Fuller* dismissed all claims for lack of jurisdiction except the § 1983 claim for injunctive relief against state officers; as to it, the district court retained jurisdiction but stayed further proceedings pending resolution of this appeal. The prisoners do not pursue their state law claims.[1]

This appeal requires us to decide whether the FLSA applies to prisoners, whether the inmates here are "employees" who are entitled to be paid a minimum wage under the FLSA, and whether the prisoners have identified a property interest that is protected under the due process clause and gives rise to a claim under 42 U.S.C. § 1983. We must also determine to what extent the prisoners' claims are barred by the Eleventh Amendment.

We consider these questions en banc to resolve the tension between our decision in *Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320 (9th Cir.1991), and the panel opinion in this case, *Hale v. Arizona,* 967 F.2d 1356 (9th Cir.1992). In *Gilbreath,* we held that prisoners working within the prison for a private plasma treatment center were not "employees" of Cutter, which ran the lab.[2] The panel in these consolidated appeals held that prisoners working for a state prison industries program and for a prisoner-owned enterprise within that program were "employees" of the state under the FLSA.[3] While we do not believe that prisoners are categorically excluded from the FLSA, we hold that the inmates in this case, who worked for programs structured by the prison pursuant to the state's requirement that prisoners work at hard labor, are not "employees" of the state within the meaning of the FLSA. The Eleventh Amendment affords no immunity to the state from suit for violations of the FLSA; however, the state is not a "person" within § 1983 and the Eleventh Amendment shields its officials from claims for damages under § 1983. As there is no factual basis for the injunctive relief sought in *Hale,* we affirm both decisions.

## I

Arizona prisoners are required by statute to "engage in hard labor for not less than

---

1. We have consolidated the two separate appeals from inmates in *Fuller* and *Hale.* The claims of 296 plaintiffs are consolidated in *Fuller.* All have appealed. Only one plaintiff, Richard Berry, has appealed in *Hale.*

2. Judge D.W. Nelson dissented.

3. Judge Fletcher dissented, on the footing that the panel was bound by *Gilbreath.*

forty hours per week."[4] Ariz.Rev.Stat. § 31–251(A). Pursuant to this requirement, Arizona prison authorities have structured various programs for convict labor, including the two programs involved in this case. The *Fuller* inmates worked for ARCOR (known as ACI since 1987), which is organized pursuant to Ariz.Rev.Stat. §§ 41–1621 et seq. and operated by the Department of Corrections. ARCOR sets up and supervises "industries or enterprises ... for the employment of prisoners in the manufacture ... of such ... products as may be needed ... by a state ... or for sale to the public." Ariz.Rev.Stat. § 41–1622. Ten to twenty percent of Arizona prisoners work for the ARCOR correctional industries program, whose goods and services include clothing, fabricated steel, livestock, dairy products, and hotel reservations for Best Western motels. Revenue from ARCOR enterprises is placed in a revolving fund, and ARCOR pays the inmates who work for it out of that fund. *See* Ariz. Rev.Stat. § 41–1624.[5]

The prison labor program in *Hale,* also offered through ARCOR, allows the establishment of an Inmate–Operated Business Enterprise (IOBE). The IOBE program permits an inmate to organize and operate a business under ARCOR supervision. ARCOR retains a portion of IOBE gross sales to pay for utilities and collects a monthly rent. Inmate wages are paid to ARCOR, which makes disbursements to inmate workers out of the ARCOR revolving fund. Berry, the only *Hale* plaintiff who appeals, worked as a bookkeeper and office manager for C/A Buckles, an IOBE enterprise which made and sold western and logo belt buckles to various entities including the United States Marine Corps, Mountain Bell, U–

Haul, and Speed–O–Fam in London, England. ARCOR leased space for the business, outside the prison walls, to the inmate-owner. C/A Buckles employed a dozen inmates, exhibited and sent catalogs to prospective buyers, and shipped hundreds of buckles monthly.[6]

## II

We have jurisdiction over these appeals under 28 U.S.C. § 1291. The district court in *Hale* entered summary judgment as to all claims. The district court in *Fuller* dismissed all claims except the claim for prospective relief under 42 U.S.C. § 1983, over which it retained jurisdiction. The court found no just reason for delay and entered final judgment on the remaining claims, which suffices to make its order final and appealable under Fed.R.Civ.P. 54(b). *See Continental Airlines v. Goodyear Tire & Rubber Co.,* 819 F.2d 1519, 1524–25 (9th Cir. 1987) (expansively construing discretion of district court in entering partial summary judgment under Rule 54(b)). Thus, we have jurisdiction over all claims in these matters except the § 1983 claim for prospective relief in *Fuller.*

■ The *Fuller* appellees contend that the notice of appeal in that case does not "specify the party or parties taking the appeal" as required by Fed.R.App.P. 3(c) and that this court therefore lacks appellate jurisdiction as to all parties except John Leroy Fuller. We disagree. All plaintiffs in the *Fuller* action were consolidated pursuant to court order. The notice of appeal in *Fuller* refers in its caption to "JOHN LEROY FULLER Plaintiffs" and in its text to "plaintiff consolidated in the captioned cause." In *Gilbreath,* we construed substantially identical language as adequately identifying consolidated plaintiffs

---

4. Not all inmates fulfill this obligation, because of the absence of available work. This, however, is immaterial to the issue of whether those who do work are "employees" for purposes of the FLSA.

5. At the time these actions were filed, inmate wages could not be paid out of general state funds. *See* former Ariz.Rev.Stat. § 41–1624(A)(2). This restraint has subsequently been deleted. *See* Ariz.Rev.Stat. § 41–1624.

6. Berry also worked as a clerk in the prison warehouse. The warehouse is outside the prison walls, and the job consisted of inventorying supplies for prison units. He applied for both jobs, which are sought after, having first worked as a prison librarian and a kitchen worker.

The inmate owner of C/A Buckles is not a defendant in *Hale.*

on appeal. *See id.*, 931 F.2d at 1322–23. The notice of appeal here is similarly sufficient.

We review de novo a district court's grant of either a motion for summary judgment or a motion to dismiss. *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). In reviewing the summary judgment in *Hale*, we determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989). When reviewing dismissal of the *Fuller* complaint, we examine the allegations of the complaint and determine whether there is any set of facts which could entitle the plaintiffs to the relief they seek. *Buckey v. County of Los Angeles*, 968 F.2d 791, 794 (9th Cir.), *cert. denied*, *City of Manhattan Beach v. Buckey*, —— U.S. ——, 113 S.Ct. 599, 121 L.Ed.2d 536 (1992).

## III

We must first resolve Arizona's argument that the Eleventh Amendment bars a suit under the FLSA against a state or its employees. It contends that amendments which extended FLSA coverage to state employees did not abrogate the states' Eleventh Amendment immunity. Arizona further argues that the power of the federal government to subject the states to regulation does not extend to subjecting a state to the jurisdiction of the federal courts.

■■■ Congress has the power under the Commerce Clause to annul a state's Eleventh Amendment immunity. *See Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 14–15, 109 S.Ct. 2273, 2281, 105 L.Ed.2d 1 (1989) (abrogation of Eleventh Amendment immunity by CERCLA). When abrogating a state's immunity, Congress must "mak[e] its intention unmistakably clear in the language of the statute." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985).

■■■ As we held in *Gilbreath*, Congress has made its intention clear in the FLSA.

By its terms, the FLSA applies to "any individual employed by a State [or a] political subdivision of a State." 29 U.S.C. § 203(e)(2)(C). Further, the Act provides that an action to enforce the FLSA "may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction." 29 U.S.C. § 216(b). A public agency explicitly includes "the government of a State or political subdivision thereof." 29 U.S.C. § 203(x). By this language, Congress has made unmistakably clear its intention to apply the FLSA to the states.

It has likewise manifested the intention that FLSA claims, including those against state employers, may be heard in federal court. Arizona argues that *Employees of the Dep't of Public Health & Welfare v. Dep't of Public Health and Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), which held that the 1966 amendments to the FLSA extending coverage to state employees did not abrogate the states' Eleventh Amendment immunity, *id.* at 285, 93 S.Ct. at 1618, controls. However, after the opinion in *Employees*, Congress amended § 16(b) of the FLSA (29 U.S.C. § 216(b)) in 1974. *See* Fair Labor Standards Amendments of 1974, § 6(d)(1), 88 Stat. 55, 61 (1974). Originally, and at the time *Employees* was decided, § 16(b) provided: "An action to recover [the liability for violating the minimum wage provisions] may be maintained in any court of competent jurisdiction...." Fair Labor Standards Act, § 16(b), 52 Stat. 1060, 1069 (1938). The 1974 amendment expanded the definition to provide: "An action to recover [such liability] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction...." 29 U.S.C. § 216(b). The specific inclusion of "public agenc[ies]" and the addition of "any Federal or State court" make the intent of Congress to render states amenable to suit under the FLSA in federal court unmistakably clear.

Arizona contends, nevertheless, that there is a difference between a state's immunity from federal regulation, which is a Tenth Amendment issue resolved by the Supreme Court in *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005,

83 L.Ed.2d 1016 (1985), and its immunity from suit in a federal court, which is an Eleventh Amendment issue. It notes that states may be sued for FLSA violations in state courts, and argues that neither *Garcia,* nor the post-*Garcia* amendment which gave states more time to comply with the FLSA, Fair Labor Standards Amendments of 1985, sec. 7, 99 Stat. 791 (1985), waives a state's immunity from being haled into federal court. Arizona cites no authority in support of this argument, and we believe it fails in the face of Eleventh Amendment jurisprudence which holds that Congress may, if it does so clearly enough, abrogate immunity from suit as well as from regulation.

*Garcia,* which held that there is no constitutional barrier to applying the FLSA to all state employees, 469 U.S. at 554, 105 S.Ct. at 1019, overruled *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which had held that the Tenth Amendment bars Congress from applying the FLSA to the states "in areas of traditional governmental functions." *Id.* at 855, 96 S.Ct. at 2476. After the decision in *Garcia,* Congress recognized the greater financial burden states would have to bear under *Garcia* than under *National League of Cities,* and amended the Act to give them time to adjust. *See* Fair Labor Standards Amendments of 1985, S.Rep. No. 159, 99th Cong., 1985 U.S.C.C.A.N. 651, 654–56. Arizona argues that this amendment merely gave states more time, but did not waive the Eleventh Amendment defense to an FLSA action. As we read it, however, the *Garcia* amendment, which provided a grace period for the additional state employees *Garcia* brought within the FLSA, was consistent with the intent already manifested in amended § 16(b), that states may be sued by an employee in federal court for violations of the FLSA.

Arizona's argument, therefore, makes too much of the fact that *Garcia* was "just" a Tenth Amendment case. Rather, on Elev-

enth Amendment issues we are guided by *Union Gas* and *Scanlon,* which direct us to look to the legislation itself. The FLSA, as it has been amended, leaves no doubt that Congress did not intend the Eleventh Amendment to bar FLSA claims by state employees in federal court.

## IV

### A

■ Assuming there is no Eleventh Amendment barrier to the FLSA claims in *Hale* and *Fuller,* as we have now held, Arizona argues that the FLSA does not apply to prisoners. Relying on Judge Trott's opinion in *Gilbreath,*[7] Arizona reasons "that it is highly implausible that Congress intended the FLSA's minimum wage protection [to] be extended to felons serving time in prison." *Gilbreath,* 931 F.2d at 1324. While it may be difficult to believe that Congress actually gave thought to the problem and decided to include prison labor within the FLSA, we cannot agree that the FLSA categorically excludes all labor of any inmate.

As a matter of statutory construction, prisoners are not on the statutory list of workers who are exempted from the FLSA. *See* 29 U.S.C. § 213. "[S]pecificity in stating exemptions strengthens the implication that employees not thus exempted ... remain within the Act." *Powell v. United States Cartridge Co.,* 339 U.S. 497, 517, 70 S.Ct. 755, 766, 94 L.Ed. 1017 (1950). Because Congress has specifically exempted nine broad categories of workers from the minimum wage provisions of the FLSA, *see* 29 U.S.C. § 213(a), but not prisoners, we are hard pressed to conclude that it nevertheless intended for all inmates to be excluded. That is a decision for the Congress, not the courts, to make. *See Carter v. Dutchess Community College,* 735 F.2d 8, 13 (2d Cir.1984) ("It would be an encroachment upon the legislative prerogative for a court to hold that a class of unlisted workers is excluded from the Act.").[8]

---

7. Judge Trott's view that the FLSA can never apply to prisoners was not joined by either the concurring or dissenting judge.

8. The Second Circuit's decision in *Carter,* holding that the FLSA may apply to a prisoner who works for an outside employer, 735 F.2d at 15, was handed down in 1984. Congress has

amended the FLSA twice since then, *see* Fair Labor Standards Amendments of 1985, 99 Stat. 787 (1985), and Fair Labor Standards Amendments of 1989, 103 Stat. 98 (1989), without taking action to limit *Carter.* Under these circumstances, congressional silence on the applicabili-

In addition to what we infer from the scheme of this statute, we have previously indicated in connection with another statute that prisoners may have an employment relationship with a prison. In *Baker v. McNeil Island Corrections Ctr.*, 859 F.2d 124 (9th Cir.1988), which was a Title VII action by a prisoner who claimed he was denied employment in the prison library on account of his race, we held that a prisoner may be an "employee." 859 F.2d at 127–28. Although the status of prisoners under Title VII is not conclusive of their status under the FLSA, we cannot ignore the similarity between the definitions of "employee" in the statutes. *See Hyland v. New Haven Radiology Assoc.*, 794 F.2d 793, 796 (2d Cir.1986) ("Since all three statutes [Title VII, the FLSA, and the Age Discrimination in Employment Act] have a similar purpose—to stamp out discrimination in various forms—cases construing the definitional provisions of one are persuasive authority when interpreting the others."). *But see Vanskike v. Peters*, 974 F.2d 806, 810 n. 5 (7th Cir.1992) (distinguishing *Baker* in context of FLSA), *cert. denied*, —— U.S. ——, 113 S.Ct. 1303 122 L.Ed.2d 692 (1993). While *Baker* is not controlling in this case, we are constrained not to hold as a matter of law that prisoners may *never* be "employees" of a prison.

Finally, we are influenced by other circuits which have held that the FLSA may be applicable to prison inmates under certain circumstances. *See Vanskike*, 974 F.2d at 808 ("We do not question the conclusions of *Carter, Watson* and [the panel opinion in] *Hale* that prisoners are not categorically excluded from the FLSA's coverage simply because they are prisoners."); *Watson v. Graves*, 909 F.2d 1549 (5th Cir.1990) (prisoners on work release); *Carter* (prisoner tutoring community college students). For prudential reasons, we avoid unnecessary conflicts with other circuits and are not persuaded that we should part company on this point.

B

The question we must resolve is whether inmates working for a prison, in a program structured by the prison pursuant to state law requiring prisoners to work at hard labor, are "employees" of the prison within the meaning of the FLSA.

Prisoners first argue that they are employees within the FLSA because the State of Arizona and ARCOR "suffer or permit [them] to work." 29 U.S.C. § 203(g).[9] They suggest that Arizona does not have to establish a correctional industries program, but chose to let ARCOR hire inmate labor; that an employment relationship exists because ARCOR profits from the work inmates perform; and that even though penological interests may be paramount in the prison-prisoner relationships, an employer-employee relationship may exist at the same time. Arizona responds that § 203(g)'s language must be "understood with common sense," *Walling v. Jacksonville Terminal Co.*, 148 F.2d 768, 770 (5th Cir.1945), and the common sense of it is that inmates are required to work as a function of their incarceration.

By its terms, the FLSA requires states to pay their employees the minimum wage. "Employee" is defined as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), including "any individual employed by a State," 29 U.S.C. § 203(e)(2)(C). "Employer" includes "a public agency," 29 U.S.C. § 203(d). "Employ" includes "to suffer or permit to work." 29 U.S.C. § 203(g).

The Supreme Court has instructed that courts are to interpret the term "employ" in the FLSA expansively. *See Nationwide Mut. Ins. Co. v. Darden*, —— U.S. ——, ——, 112 S.Ct. 1344, 1350, 117 L.Ed.2d 581 (1992). It has also held that, as a general rule, whether there is an employment relationship under the FLSA is tested by "'economic reality' rather than 'technical concepts.'" *Goldberg v. Whitaker House Coop.*, 366 U.S.

---

ty of the FLSA to prisoners is some indication of its intent not to exempt prisoners from the FLSA.

**9.** They also point to child labor regulations which state:

The words "suffer or permit to work" include those who suffer by a failure to hinder and those who permit by acquiescence in addition to those who employ by oral or written contract.

29 C.F.R. 570.113(a).

28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961).

We elaborated the economic reality test in *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir.1983) by indicating that courts are to consider the totality of the circumstances of the relationship, including whether the alleged employer has the power to hire and fire the employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records. *Id.* at 1470. While these factors "provide a useful framework for analysis . . ., they are not etched in stone and will not be blindly applied." *Id.*

Inmates argue that the prison had the right to "hire and fire" them by allowing or disallowing them to work, controlled the time and conditions under which they worked, determined the rate of pay, and kept records. Arizona argues that it has only a security interest in inmates and maintains control over an inmate employee as it does over any convicted inmate in its custody.

Regardless of how the *Bonnette* factors balance, we join the Seventh Circuit in holding that they are not a useful framework in the case of prisoners who work for a prison-structured program because they have to.[10] In *Vanskike v. Peters*, 974 F.2d 806 (7th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1303, 122 L.Ed.2d 692 (1993), the plaintiff inmate worked in Illinois prisons as a janitor, kitchen worker, gallery worker, and knit-shop worker. As Judge Cudahy wrote for the court,

> the *Bonnette* factors fail to capture the true nature of the relationship for essentially they presuppose a free labor situation. Put simply, the DOC's "control" over [the prisoner] does not stem from any remunerative relationship or bargained-for exchange of labor for consideration, but from incarceration itself. The control that the DOC exercises over a prisoner is nearly total, and control over his work is merely incidental to that general control.

974 F.2d at 809. *See also Gilbreath*, 931 F.2d at 1331 (no employment relationship because "inmate labor belongs to the institution") (concurring opinion); *Harker v. State Use Indus. Envelope Shop Inmates*, 990 F.2d 131, 133 (4th Cir. Mar. 24, 1993) (*quoting Vanskike; citing Gilbreath*); *Alexander v. SARA, Inc.*, 721 F.2d 149, 150 (5th Cir.1983) ("there was no employer-employee relationship, because the inmates' labor belonged to the penitentiary"). *Cf. Alvarado Guevara v. INS*, 902 F.2d 394, 396 (5th Cir.1990) (INS detainees who "are under the direct supervision and control of a government entity should not be protected under the FLSA").

In *Bonnette* we were considering whether chore workers paid for by California and federal funds but supervised by the persons for whom they provided home care services were employees under the FLSA. *Bonnette*, 704 F.2d at 1467–68. The case of inmate labor is different from this type of situation where labor is exchanged for wages in a free market. Convicted criminals do not have the right freely to sell their labor and are not protected by the Thirteenth Amendment against involuntary servitude. *See Draper v. Rhay*, 315 F.2d 193, 197 (9th Cir.), *cert. denied,* 375 U.S. 915, 84 S.Ct. 214, 11 L.Ed.2d 153 (1963). Under Arizona law, the state "has the authority to require that each able-bodied prisoner . . . engage in hard labor for not less than forty hours per week. . . ." Ariz.Rev.Stat. § 31–251(A). Therefore, as *Vanskike* focused the question:

> The *Bonnette* factors, with their emphasis on control over the terms and structure of the employment relationship, are particularly appropriate where (as in *Bonnette* itself) it is clear that some entity is an "employer" and the question is which one. The dispute in this case is a more fundamental one: Can [these] prisoner[s] plausibly be said to be "employed" in the relevant sense at all?

974 F.2d at 809.

■ We think not, because in both *Fuller*, where the inmates worked for ARCOR, and *Hale*, where Berry worked both for ARCOR

---

10. Inmates submit that it is significant that they had to apply for the work they did and were screened for security and other purposes. The fact that prison authorities may have structured certain programs more selectively than others does not, however, make them less of a prison-structured program pursuant to the State of Arizona's requirement that prisoners work at hard labor.

and an inmate operated enterprise, the economic reality of the relationship between the worker and the entity for which work was performed lies in the relationship between prison and prisoner. It is penological, not pecuniary. As Judge Cudahy wrote in *Vanskike:*

> Prisoners are essentially taken out of the national economy upon incarceration. When they are assigned work within the prison for purposes of training and rehabilitation, they have not contracted with the government to become its employees. Rather, they are working as part of their sentences of incarceration.

974 F.2d at 810. Thus, the totality of the circumstances does not bespeak an employer-employee relationship as contemplated by the FLSA.

In this view we are not influenced by Arizona's reliance on state law which declares that an inmate is not an employee of the State or the DOC, Ariz.Rev.Stat. § 31–254(J) (formerly Ariz.Rev.Stat. § 31–254(I)).[11] Prisoners correctly contend that federal law controls their status as employees under the FLSA and that the state cannot rely on § 31–254(J) to defeat their claim. Under the Supremacy Clause, this state statute has no effect on the scope of the FLSA.

However, we are influenced by the fact that no other circuit has construed the relationship between a prison and a prisoner with a hard-time obligation who works on a program structured by the prison as an employment relationship within the FLSA. *See Vanskike; Alexander v. SARA, Inc.*, 559 F.Supp. 42 (M.D.La.) (labor in plasmapheresis program run by outside company belonged to institution), *aff'd*, 721 F.2d 149 (5th Cir.1983); *Sims v. Parke Davis & Co.*, 334 F.Supp. 774 (E.D.Mich.) (work assignments up to prison), *aff'd*, 453 F.2d 1259 (6th Cir. 1971), *cert. denied*, 405 U.S. 978, 92 S.Ct. 1196, 31 L.Ed.2d 254 (1972); *Hudgins v. Hart*, 323 F.Supp. 898 (E.D.La.1971) (prisoner worked at plasma treatment center pursuant to sentence to hard labor); *see also Wat-son* (distinguishing *Alexander, Hudgins,* and *Young v. Cutter Biological*, 694 F.Supp. 651 (D.Ariz.1988), *aff'd sub nom. Gilbreath v. Cutter Biological*, 931 F.2d 1320 (9th Cir. 1991) because of hard-time obligation and holding that prisoner on work release program was employee of outside company for whom work was performed). This follows because, as the Fifth Circuit put it in *Watson*, "the 'hard time' inmates' labor d[oes] indeed 'belong to the institution' and c[an] be disposed of legitimately within the discretion of the correction facility or agency." 909 F.2d at 1555.

Because prisoners in *Hale* and *Fuller* worked for programs structured by the prison pursuant to the state's requirement that prisoners work at hard labor, the economic reality is that their labor belonged to the institution. We hold, therefore, that they were not "employees" of the prison entitled to be paid a minimum wage under the FLSA.

## C

Inmates urge that to deny them a minimum wage would thwart the intent of Congress in the FLSA to protect against unfair competition in the market place for both goods and labor. They argue that putting a floor under the wages prisoners are paid to make prison goods assures the private sector in competition with those goods a fair opportunity of gaining the customer, and they make the point that the mere fact that prison workers are "captive" does not make their product less intrusive upon interstate commerce if, as here, the products enter the stream of interstate commerce. Arizona counters that the primary purpose of the FLSA is to promote and improve the standard of living of workers, whereas the Ashurst–Sumners Act, ch. 412, 49 Stat. 494 (1935) (codified as amended at 18 U.S.C. §§ 1761–1762 (1992)), which was enacted before the FLSA to criminalize the transportation of prison-made goods in interstate commerce, was intended to prohibit and penalize unfair competition in the market for prod-

---

11. Section 31–254(J) provides:

Nothing in this section is intended to restore, in whole or in part, the civil rights of any prisoner. No prisoner compensated under this section shall be considered as an employee or to be employed by the state or the department of corrections, nor shall any such prisoner come within any of the provisions of the workers' compensation ... or be entitled to any benefits thereunder whether on behalf of himself or of any other person.

ucts. It contends that Ashurst–Sumners in effect occupies the field for production of prison goods and payment of wages to prisoners and for this reason, Arizona argues, Congress did not intend the FLSA to apply to prison labor. Inmates, on the other hand, see Ashurst–Sumners as an extension of the FLSA because its purpose, like that of the FLSA, is to promote the lot of the individual worker and protect other workers from unfair competition from products made by underpaid labor.

Our conclusion that prisoners in these cases are not "employees" of the prison entitled to a minimum wage is consistent with the purpose of the FLSA. It was enacted because Congress found that the existence "in industries engaged in commerce or in the production of goods for commerce" [12] of labor conditions detrimental to maintaining minimum standards of living necessary for health, efficiency and general well-being of workers perpetuates substandard conditions among workers, burdens commerce, constitutes an unfair method of competition in commerce, leads to labor disputes, and interferes with the orderly and fair marketing of goods. 29 U.S.C. § 202(a).[13] We agree with Arizona that the problem of substandard living conditions, which is the primary concern of the FLSA, does not apply to prisoners, for whom clothing, shelter, and food are provided by the prison. See Vanskike, 974 F.2d at 810 ("the payment of minimum wage for a prisoner's work in prison would not further the policy of ensuring a 'minimum standard of living' "); Alexander, 721 F.2d at 150 (labor of inmates sentenced to hard labor belongs to the institution, so there is no need to protect "the standard of living and general well-being of the worker in American industry").

Nor do we believe that a different result is required because of Congress's concern that substandard wages cause unfair competition. Even though "unfair competition," broadly conceived, encompasses both product and labor markets, the effect in the labor market is what prompted congressional concern with unfair competition in the FLSA. As President Roosevelt's message to Congress accompanying the FLSA stated:

> And so to protect the fundamental interests of free labor and a free people we propose that only goods which have been produced under conditions which meet the minimum standards of free labor shall be admitted to interstate commerce.

President Roosevelt's Message to Congress on the Fair Labor Standards Act, May 24, 1937, in S.Rep. No. 884, 75th Cong., 1st Sess., at 2. The Supreme Court recognized the same point in Powell:

> In this Act [the FLSA], the primary purpose of Congress was not to regulate interstate commerce as such. It was to eliminate, as rapidly as practicable, substandard labor conditions throughout the nation. It sought to raise living standards without substantially curtailing employment or earning power.

339 U.S. at 509–10, 70 S.Ct. at 762. Congress has quoted this language several times in the legislative history of subsequent amendments to the FLSA. See, e.g., Fair Labor Standards Amendments of 1961, S.Rep. No. 145, 87th Cong., 1961 U.S.C.C.A.N. 1620, 1625; Fair Labor Standards Amendments of 1974, H.R.Rep. No. 913, 93rd Cong., 1974 U.S.C.C.A.N. 2811, 2817. Thus, while the fact that prison-made goods are sold in interstate commerce impli-

12. " 'Industry' means a trade, business, industry, or other activity, or branch or group thereof, in which individuals are gainfully employed." 29 U.S.C. § 203(h). This definition does not neatly fit prison industries, even those engaged in the production of goods for commerce, since prisoners whose labor is required by statute cannot be said to be "gainfully employed."

13. Section 202(a) declares in full:
　(a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the

minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce....
29 U.S.C. § 202(a).

cates congressional concern with unfair competition, nothing in the FLSA indicates that that fact alone should convert the relationship between prison and prisoner to one of employer-employee such that prisoners working on a program structured by the prison are entitled to a minimum wage.[14]

We are buttressed in this view because Congress has specifically addressed its concern with unfair competition in the products market from prison-made goods in the Ashurst–Sumners Act.[15] That Act was intended to combat "the evils attending the sale of [prison-made] goods in competition with goods manufactured and produced by free labor," S.Rep. No. 906, 74th Cong., 1st Sess. (1935), and "proceeded upon the view 'that free labor, properly compensated, cannot compete successfully with the enforced and unpaid or underpaid convict labor of the prison.'" *Kentucky Whip & Collar Co. v. Illinois Cent. Ry. Co.*, 299 U.S. 334, 351, 57 S.Ct. 277, 282, 81 L.Ed. 270 (1937).[16] As Judge Cudahy wrote in *Vanskike*, "[i]t is difficult to imagine that Congress would have enacted legislation in 1938 that rendered its recently passed prison-goods law essentially superfluous (for the FLSA, so construed, would have addressed the problem of unfair competition from cheaply made prison goods by eliminating the low-labor-cost advantage)." 974 F.2d at 812; *see also Harker*, at 134.

Ashurst–Sumners has since been amended, most substantively in 1979 when Congress excepted goods made by prisoners in pilot projects who are paid the prevailing wage in the locality, less 80% for taxes, room and board, family support payments and victim compensation. Justice System Improvement Act of 1979, § 827(a), 93 Stat. 1215 (1979) (codified as amended at 18 U.S.C. § 1761(c) (1992)).[17] Therefore, legislation dealing with the distribution of prisoner-made goods in commerce, and in competition with similar products produced by others, has been in place throughout the history of the FLSA. This suggests that Congress did not intend its general concern with unfair competition in the FLSA to require payment of minimum wages to prisoners working for prison programs, as its more specific concern with unfair competition on account of prison-made goods had been dealt with in the Ashurst–Sumners Act. Rather, the fact that Ashurst–Sumners precludes—and prescribes a remedy in the form of criminal sanctions for—introduction of low-cost prison goods into the channels of commerce to protect private business from competition in the product market indicates that Congress's concern with unfair competition in the FLSA will not be subverted by declining to apply its minimum wage standards to convict labor in prison-structured programs.[18]

---

**14.** We disagree with the dissent's contention that Congress's stated concern with unfair competition in § 202(a) of the FLSA controls the determination of the presence of an employment relationship, as defined in § 203 of the FLSA. While prevention of unfair competition is one of the five purposes of the FLSA, *see supra* note 13, no case has ever treated the presence of unfair competition as an element of an action under the FLSA.

**15.** Section 1 of the Act, as amended, provides:
(a) Whoever knowingly transports in interstate commerce or from any foreign country into the United States any goods, wares, or merchandise manufactured, produced, or mined, wholly or in part by convicts or prisoners, except convicts or prisoners on parole, supervised release, or probation, or in any penal or reformatory institution, shall be fined not more than $1,000 or imprisoned not more than one year, or both.
18 U.S.C. § 1761(a).

**16.** Whatever the views of Congress on unfair competition in adopting the Ashurst–Sumners

Act, it is clear that the statute, which was enacted three years before the FLSA, in no way creates a right to minimum wages for prisoners under the later statute. *See Wentworth v. Solem*, 548 F.2d 773, 775 (8th Cir.1977) (no private cause of action for minimum wages under 18 U.S.C. § 1761). Indeed, the implication of the Ashurst–Sumners Act is that prisoners may be paid lower wages than non-prisoners—otherwise the statute would not be necessary.

**17.** The IOBE program in *Hale* received a certificate of compliance with 18 U.S.C. § 1761(c). Inmates suggest that this approval was based on false representations by ARCOR; however, whether Arizona is or is not in compliance with § 1761 is not material to this appeal. Both parties agree that the Ashurst–Sumners Act is a criminal statute that affords no private, civil right of action. There is, in any event, no evidence of criminal prosecution for non-compliance.

**18.** The dissent argues that the FLSA and the Ashurst–Sumners Act are "mutually supplemen-

Finally, in considering whether Congress intended the FLSA to encompass convict labor in prison-structured programs, we cannot ignore the fact that prison industries programs have existed for a long time, Congress has been aware at least since passage of the Ashurst–Sumners Act in 1935 that prison-produced goods pose a threat to competition, and important penological purposes are served by these programs. Correctional industries of the sort sponsored by ARCOR in these cases occupy idle prisoners, reduce disciplinary problems, nurture a sense of responsibility, and provide valuable skills and job training. *See* Sharon Goodman, Note, *Prisoners as Entrepreneurs: Developing a Model for Prisoner–Run Industry*, 62 B.U.L.Rev. 1163, 1163–64 (1982) (citing various authority). Absent some framework similar to Ashurst–Sumners, which allows prisons to recoup expenses for room and board and requires prisoners to make payments for support and restitution, 18 U.S.C. § 1761(c)(2), Congress cannot have intended the FLSA to impose a minimum wage obligation that would jeopardize prison industries programs structured by and for prisons.

For these reasons, we conclude that the economic reality in *Hale* and *Fuller*—that prisoners who work for programs structured by a prison pursuant to state law requiring hard labor are not "employees" of the prison entitled to a minimum wage—comports with the purpose of the FLSA.

## V

■ Inmates also argue that Ariz.Rev. Stat. § 31–254 and § 41–1623(E) (now repealed) give them a liberty interest in minimum wages of which they were deprived without due process ·of law. Section 31–254(A) provides, in part:

> If the director [of the DOC] enters into a contract ... with a private person, firm, corporation or association the compensation shall be as prescribed by the person, firm, corporation or association but shall not be below the minimum wage.

At the time the events at issue here took place, § 41–1623(E) provided:

> Except as prohibited by applicable provisions of the United States Code, inmates of correctional institutions of this state may be employed in the manufacture and processing of products for introduction into interstate commerce, so long as they are paid no less than the prevailing minimum wage.

Inmates seek to enforce these rights under 42 U.S.C. § 1983.[19]

### A

■ The State of Arizona argues that the Eleventh Amendment bars inmates' § 1983 claims for monetary damages and that § 1983 does not apply to a state or its officials. Section 1983 does not abrogate the states' Eleventh Amendment immunity from suit. *See Quern v. Jordan*, 440 U.S. 332, 344–45, 99 S.Ct. 1139, 1147, 59 L.Ed.2d 358 (1979). Furthermore, a state is not "person" within the meaning of § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65–66, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989). This limitation on § 1983 also extends to "arms of the State." *Id.* at 70, 109 S.Ct. at 2311.

Inmates contend that the ARCOR program is financially separate from the state, in

---

tary," like the FLSA and the Walsh–Healey Act, ch. 881, 49 Stat. 2036 (codified as amended at 41 U.S.C. §§ 35–45) as interpreted in *Powell*, 339 U.S. at 515–20, 70 S.Ct. at 764–767. Dissent at 1404. We disagree for several reasons. First, the Walsh–Healey Act applies to "all persons employed" (41 U.S.C. § 35(b)) on government contracts who, unlike prisoners working pursuant to a hard labor requirement, fit the definition of "employees" under the FLSA. Second, the Walsh–Healey Act itself provides that it "shall not apply to convict labor which satisfies the conditions of section 1761(c) [of the amended Ashurst–Sumners Act]...." 41 U.S.C. § 35(d). Third, the FLSA did not render ·the Walsh–Hea-

ley Act superfluous—as it would have rendered the Ashurst–Sumners Act if applied to prison labor—because "the 'prevailing minimum wages' required by the Walsh–Healey Act [are in most instances] more advantageous to employees than the minimum· wages prescribed by the [FLSA]...." *Powell*, 339 U.S. at 519, 70 S.Ct. at 767.

**19.** As noted, *supra* at 1389, we lack jurisdiction over the *Fuller* plaintiffs' claim for prospective relief against state officials under § 1983, because the district court in *Fuller* did not enter final judgment as to that claim and retained jurisdiction as to it.

that its monies do not pass through the state general fund. Because ARCOR is like a private business, generating income apart from tax revenue or legislative appropriation, they suggest an award in this case would not impact the state treasury and thus does not implicate the Eleventh Amendment.

■■■ We have no trouble concluding that the Arizona Department of Corrections is an arm of the state. Whether ARCOR is, too, is a closer question. To determine if a governmental agency is an arm of the state, we look to state law and examine "whether a money judgment would be satisfied out of state funds, whether the entity performs central governmental functions, whether the entity may sue or be sued, whether the entity has the power to take property in its own name or only the name of the state, and the corporate status of the entity." *Mitchell v. Los Angeles Community College Dist.,* 861 F.2d 198, 201 (9th Cir.1988), *cert. denied,* 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1989).

Arizona law treats ARCOR as a part of the state government. *See* Ariz.Rev.Stat. §§ 41–1621, et seq. ARCOR is managed by the director of the DOC, Ariz.Rev.Stat. § 41–1623(A), and intermingles its funds with the state treasury, Ariz.Rev.Stat. § 41–1624(C). The first two *Mitchell* factors therefore weigh in favor of finding that ARCOR is an arm of the state: a money judgment against ARCOR would be satisfied out of state funds, since the authorized purposes for the AR-COR revolving fund do not include payment of judgments, Ariz.Rev.Stat. § 41–1624(A), and ARCOR participates in the central governmental function of operation of prisons. Arizona law is not explicit as to the final three *Mitchell* factors. However, inmates admit in their pleadings that ARCOR is a subdivision of the State of Arizona. *See, e.g., Hale* First Amended Complaint ("defendant ARCOR Enterprises . . . [is a] subdivision[ ] of defendant state"); *Fuller* Complaint (same). *Cf. Sable Communications of California, Inc. v. Pacific Tel. and Tel. Co.,* 890 F.2d 184, 191 (9th Cir.1989) (California Public Utilities Commission is an arm of the state); *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1442–43 (9th Cir.1989) (University of California is an arm of the state). For these reasons, we conclude that ARCOR is an arm of the State of Arizona and that it is not a person within § 1983.

■■■ Inmates argue that they may obtain monetary relief against the individual officials because they were acting outside the scope of their duties by refusing to follow the statutory duty to pay minimum wages. This allegation does not, however, avoid the Eleventh Amendment bar as the conduct complained of is not personal, and money damages for wages due would be paid out of the state treasury regardless of whether the officials were acting in accord with statutory duties. *See Edelman v. Jordan,* 415 U.S. 651, 653, 677, 94 S.Ct. 1347, 1351, 1362, 39 L.Ed.2d 662 (1974). Therefore, inmates may maintain an action under § 1983 against the individual officers for prospective relief only. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (injunctive relief available under § 1983 against state official).

B

Berry is the only appellant whose claim for injunctive relief is before us. He asserts a protected interest in minimum wages under Arizona law. He contends that he seeks no more than the plaintiff in *Piatt v. MacDougall,* 773 F.2d 1032 (9th Cir.1985) (en banc), and that *Piatt* establishes a protected liberty interest in recovery of wages accrued under color of state law.

In *Piatt,* we were concerned with a prisoner's allegation that he had worked as part of a contract with a private entity and was therefore entitled to pay at least equal to the minimum wage under § 31–254. We held that the state had not deprived Piatt of a constitutionally protected liberty interest, but that he could not be denied the property right to compensation created by statute without a meaningful hearing at a meaningful time. *Piatt,* 773 F.2d at 1036. Berry's request in this case is different, however, because he did not work for a private entity pursuant to a contract such that § 31–254's obligation was ever triggered.

■■■ A § 1983 plaintiff must allege more than a statutory basis for his claim; he must also allege facts which support the claim. Summary judgment is appropriate if "a party

... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In order to show an entitlement under § 31–254, a prisoner must show that he is working pursuant to "a contract ... with a private person, firm, corporation or association." Ariz.Rev.Stat. § 31–254(A). We agree with the district court that in *Hale*, "there is no evidence supporting a claim that the prison's authorization of the buckle shop constituted a contract as defined by the Arizona statute." Berry may not rely on § 41–1623(E), which does not require a contractual relationship with a private entity, because he is limited to prospective relief by the Eleventh Amendment and this statute has been repealed. Accordingly, we affirm the district court's grant of summary judgment on Berry's § 1983 claim for prospective relief against state officers.

## VI

We conclude that the notice of appeal in *Fuller* was proper; that the Eleventh Amendment does not bar the prisoners' FLSA claim; that there is no employer-employee relationship between the prisoners and the state under the FLSA; that the State of Arizona, the DOC, and ARCOR are not "persons" within the meaning of 42 U.S.C. § 1983; that the claims for monetary damages against the individual officers are barred by the Eleventh Amendment; and that the district court in *Hale* properly granted summary judgment on the claim for injunctive relief under § 1983 against the individual state officials. Both judgments are therefore **AFFIRMED.**

NORRIS, Circuit Judge, with whom Circuit Judge FLETCHER joins, dissenting:
[F]ree labor, properly compensated, cannot compete successfully with the enforced and unpaid or underpaid convict labor of the prison.

*Whitfield v. Ohio*, 297 U.S. 431, 439, 56 S.Ct. 532, 535, 80 L.Ed. 778 (1936).

Richard Berry worked at C/A Buckles, a business that employed about a dozen workers and produced belt buckles for groups such as the Marine Corps, U–Haul, and the University of Texas Longhorns booster club. Today, the majority holds that the State of Arizona is not required to pay Berry or his co-workers the federally-mandated minimum wage because they were inmates at the Arizona State Prison, working for a "prison-structured program" pursuant to Arizona's requirement that prisoners work at hard labor. In so holding, the majority removes by fiat a large, if ill-defined, group of workers from the coverage of the Fair Labor Standards Act ("FLSA"), judicially creating an exemption not found in the statute.

In passing the FLSA, Congress sought to improve the standard of living of workers across the land by outlawing substandard wages in all industries competing in interstate commerce, subject only to narrow and explicit exceptions. The majority adds an exemption for the prisoners in this case because they are forced to work, and in any case do not need to make a living wage. The majority ignores the obvious point that precisely for these reasons prisoners are unable to demand the minimum wage without the power of the law behind them. By focusing too narrowly on the technical legal relationship between the State of Arizona and Richard Berry, the majority slights Congress' major concern—barring the products of sub-minimum wage labor from the channels of interstate commerce. When this case is understood in light of Congress' concern with the pernicious competitive effect of cheap labor, it becomes unnecessary to have any "particular sympathy for prison inmates" to conclude that the FLSA applies to prison labor. *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1332 (9th Cir.1991) (D.W. Nelson, J., dissenting).

### I

By its own terms, the FLSA covers these Arizona prisoners. The Act says "[e]very employer shall pay to each of his employees ... not less than $4.25 an hour." 29 U.S.C. § 206(a). The Act includes in its definition of "employee" any "individual employed by a State." 29 U.S.C. § 203(e)(2)(C). True to its conventional meaning, "employ" as used in the FLSA means "to suffer or permit to work," 29 U.S.C. § 203(g), which describes

the obligation (or opportunity) the State of Arizona afforded Richard Berry. The statute lists a number of exemptions to its coverage, but prison labor is not on the list. *See* 29 U.S.C. § 213. Thus, under the plain language of the Act, the appellants are employees who must be paid at least $4.25 an hour.

The majority recognizes all this. It acknowledges that prisoners are not included on the statute's list of exemptions, and that " '[s]pecificity in stating exemptions strengthens the implication that employees not thus exempted ... remain within the Act.' " Opinion at 1391 (*quoting Powell v. United States Cartridge Co.*, 339 U.S. 497, 517, 70 S.Ct. 755, 766, 94 L.Ed. 1017 (1950)). The majority cites approvingly Ninth Circuit case law making working prisoners employees for purposes of Title VII, and case law from other circuits interpreting the FLSA the same way. *Id.* at 1392. The majority also doffs its hat to the Supreme Court, acknowledging that the Court has "instructed [us] to interpret the term 'employ' in the FLSA expansively." Opinion at 1392 (*quoting Nationwide Mut. Ins. Co. v. Darden*, —— U.S. —— ––––, 112 S.Ct. 1344, 1350, 117 L.Ed.2d 581 (1992)). But after saying that the FLSA does not "categorically exclude" inmate labor, the majority nevertheless decides that prisoners working in programs "structured by a prison pursuant to state law requiring hard labor" are in fact excluded. *Id.* at 1391, 1397.

The first problem with the majority's holding is that it lacks any grounding in the statute. The crux of the majority's argument is that the FLSA does not apply because prisoners do not contract for their labor in a traditional bargained-for exchange, but are forced to work. *See* opinion at 1393–1394. While the statute expressly excludes from its definition of "employee" "any individual who *volunteers* to perform services for a public agency," 29 U.S.C. § 203(e)(4) (emphasis added), it makes no special provision for those who are *forced* to work. Indeed, if

being forced to work means "being subject to" work, then in forcing the prisoners to work the state "suffers" them to do so. *See* Random House College Dictionary 1313 (rev. ed.). By the very terms of the FLSA, this means the state "employs" them. *See* 29 U.S.C. § 203.

Not just the text of the statute, but also Congress' goals in enacting the FLSA weigh heavily on the side of applying it to inmates. As the majority acknowledges, Congress' primary goal was to eliminate substandard labor conditions throughout the nation. *See Powell v. United States Cartridge Co.*, 339 U.S. 497, 509–10, 70 S.Ct. 755, 761–62, 94 L.Ed. 1017 (1950). Unlike the majority, however, Congress specifically recognized that substandard wages for any group of workers threaten the standard of living of others. Congress declared that

> the existence ... of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to *spread and perpetuate such labor conditions* among the workers of the several States; ... [and] (3) *constitutes an unfair method of competition* in commerce.

29 U.S.C. § 202(a) (emphasis added). In other words, Congress understood that as part and parcel of its attempt to assure a minimum wage for all workers, it must eliminate from the channels of commerce goods produced at a subminimum wage.[1]

The congressional focus on unfair competition from cheap labor comports with common sense economics. Richard Berry and his fellow prison workers produce belt buckles that may be sold at prices that put downward pressure on prices charged by other producers of belt buckles, producers who must pay their workers at least $4.25 an hour. To compete, such producers must cut costs—by lowering wages to the minimum if they are

---

1. I do not, as the majority claims, say that Congress' concern with unfair competition "controls" whether a person is an FLSA employee. Opinion at 1396, n. 14. What I do say is that Congress' concern with unfair competition is an important factor that should be considered in interpreting the statute. The question is not whether unfair competition is "an element of an action under the FLSA" (*id.*); of course it's not. The question is whether Congress' concern with the harmful effect that cheap labor has on the living standards of all workers should inform our interpretation of the statute.

**1402**

not already there, by reducing other employee benefits, or by laying off workers. And because the elasticity of the demand for belt buckles is intrinsically limited, an increase in the supply of belt buckles produced by cheap inmate labor inevitably undercuts the bargaining power of the free workers Congress designed the FLSA to protect. In other words, the absence of a level playing field between prison and private sector belt-buckle producers will "spread and perpetuate" unemployment and substandard labor conditions among workers in the private sector.[2] The reality of this competition is illustrated in the experience of an Arizona steel manufacturer with unfair competition from AR-COR. ARCOR submitted a bid in the private steel construction market for $30,000 less than his $78,900 price. The manufacturer complained that ARCOR should not "be competing against private business on private projects." He asked, "Where can I get guys to work for me at 50 cents an hour?"

The Supreme Court has expressly recognized Congress' concern with the harmful effects of cheap labor. In *Powell v. United States Cartridge Co.*, 339 U.S. at 509 n. 12, 70 S.Ct. at 763 n. 12, the Court observed that "one major means of spreading substandard labor conditions was recognized to be through the lowering of prices for goods produced under substandard conditions...." Noting the "bold and sweeping terms" of the FLSA, *id.* at 516, 70 S.Ct. at 766, the Supreme Court refused to exempt employees of a federal government contractor from the FLSA. The majority today does not heed the Supreme Court's constant refrain that the FLSA is designed to prevent the "distribution of goods produced under substandard labor conditions, which competition is injurious to ... commerce...." *United States v.*

*Darby*, 312 U.S. 100, 115, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941). *See also Citicorp Industrial Credit, Inc. v. Brock*, 483 U.S. 27, 37, 107 S.Ct. 2694, 2700, 97 L.Ed.2d 23 (1987); *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 299, 105 S.Ct. 1953, 1960, 85 L.Ed.2d 278 (1985); *Maryland v. Wirtz*, 392 U.S. 183, 189, 88 S.Ct. 2017, 2020, 20 L.Ed.2d 1020 (1968).

The majority briefly acknowledges that "the fact that prison-made goods are sold in interstate commerce implicates congressional concern with unfair competition." Opinion at 1395. Yet enigmatically, and in the very next breath, the majority shrugs off Congress' concern, declaring that

> nothing in the FLSA indicates that that fact alone should convert the relationship between prison and prisoner to one of employer-employee such that prisoners working on a program structured by the prison are entitled to a minimum wage.

*Id.* (footnote omitted). The majority's argument has several flaws, not the least of which is that it reads like *ipse dixit* rather than analysis. Although the FLSA says nothing about the relationship between prisons and prisoners, the Act's over-arching concern with unfair competition from cheap labor weighs in favor of interpreting the FLSA as covering prison workers who compete with workers in the private sector. To divine a contrary congressional intent from the FLSA's failure to mention prison labor explicitly is to turn the construction of the FLSA on its head. Courts have consistently presumed that workers are covered by the Act unless explicitly *excluded;* the majority presumes that prison workers are not covered unless explicitly *included. See, e.g., Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 391, 80 S.Ct. 453, 455, 4 L.Ed.2d 393 (1960).[3]

**2.** The United States has even protested the use of prison labor in goods produced outside our borders for export to our country on the ground that those cheaply-produced goods deny competing United States industries a "level playing field." *Acting Commissioner Outlines Strategy for Implementing Administration's Goals*, BNA Int'l Trade Daily, Mar. 4, 1993; *see also Customs to Block Tea, Socks Allegedly Made by Chinese Forced Labor*, BNA Int'l Trade Daily, July 13, 1992. In 1992, the United States and China signed a memorandum of understanding that bans Chinese prison-made goods from being imported into the United States. *U.S., China Sign Understanding*

*Prohibiting Prison Labor Exports*, BNA Int'l Trade Daily, Aug. 10, 1992.

**3.** The traditional approach is compelled by the structure of the Act, which first states in broad terms at section 206 that employees must be paid the minimum wage, and then offers at section 213 certain exceptions to that rule—exceptions we must construe narrowly. *See Arnold*, 361 U.S. at 392, 80 S.Ct. at 456. Section 213 makes no exception for prison workers. The majority recognizes this fact, *see* opinion at 1391, but concludes nonetheless that the FLSA does not apply to Berry and his fellow prison workers.

The majority's view that Congress apparently had little concern with the injurious effect of cheap prison labor on competition is inexplicable. The fact that prisoners are forced to work is irrelevant because the unfair competitive effect is the same regardless whether the worker is forced to work or free to work. Indeed, the less bargaining power workers have, the greater the need to apply the FLSA to protect them and those who compete against them. As the Supreme Court has explained, the FLSA was passed in

> recognition of the fact that due to the *unequal bargaining power* as between employer and employee, certain segments of the population required federal compulsory legislation *to prevent private contracts on their part* which endangered national health and efficiency and as a result the free movement of goods in interstate commerce.

*Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 706–07, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945) (emphasis added). The majority seizes upon the prisoner's lack of bargaining power as evidence that he is not an employee of the state. But it is exactly the worker who lacks bargaining power that the FLSA seeks to reach, for this is the worker who is most likely to be working for substandard wages and thereby "endanger[ing] national health and efficiency." *Id.* Congress understood that allowing any group of workers to make "private contracts" to work below the minimum wage tends to depress the wages or threaten the standard of living of other workers in competing industries. The fact that a prisoner may lack the choice not to work does not reduce the unfair competitive effect of his work product when it enters the channels of commerce.

The majority's premise—that the relationship between prison and prisoner is somehow inconsistent with FLSA coverage—is equally peculiar. On the ground that a hard-time inmate's labor belongs to the institution, the majority holds that prisoners are not employees under the FLSA. Opinion at 1395. The majority provides no analysis explaining why the sterile concept of "belonging to the institution" should be the test of "economic reality." *See Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961) (" 'economic reality' rather than 'technical concepts' " determines whether there is an employment relationship under the FLSA). The economic reality is that Richard Berry and his fellow plaintiffs work. Their labor produces goods and services that are sold in the channels of commerce. And ARCOR pays them for their efforts. Common sense tells us this relationship is both penological *and* pecuniary. *Cf.* opinion at 1393–94. The majority fixates on whether the prisoners have a contractual right to bargain for their labor. This technical legal concept, unrelated to Congress' design in the FLSA, diverts the analysis from the economic *reality* of this case.

While the majority purports to reject Judge Trott's view that prisoners are categorically excluded from the FLSA, *see* opinion at 1391, it offers no principled basis for distinguishing prisoners who are covered by the FLSA from those who are not. The majority's holding thus "encourages unnecessary litigation and invites confusion in an area of the law that should be quite clear." *Harker v. State Use Industries,* 990 F.2d 131 (4th Cir.1993). The majority says, "While we do not believe that prisoners are categorically excluded from the FLSA, we hold that the inmates in this case, who worked for programs structured by the prison pursuant to the state's requirement that prisoners work at hard labor, are not 'employees' of the state within the meaning of the FLSA." Opinion at 1388. First, the majority restricts its FLSA exemption to prisoners who are forced to work. But, at least in Arizona, this restriction means little because the Department of Corrections may require *all* able-bodied prisoners to work at hard labor. Ariz.Rev.Stat. § 31–251(A). Second, the exemption is restricted to prisoners who work under "prison-structured" programs. However, "prison-structured" is so lacking in definition that it has no meaning as a limiting factor. Since, as the majority recognizes, prison authorities exercise virtually total control over prisoners' activities, including their work, opinion at 1393, any work program using inmate labor is presumably "prison-structured." Furthermore, the majority points to nothing in the FLSA or its legislative history which would justify an exception that distinguishes between prisoners working

in "prison-structured" programs from prisoners working in "non-prison-structured" arrangements. Thus, the standards limiting the exception the majority writes into the FLSA are both amorphous and ad hoc.

The majority's announcement of a previously undiscovered exemption to the FLSA conforms with neither the text nor the purpose of the statute. In exempting the prisoners, the majority does what the Supreme Court has previously refused to do: namely, "restrict the Act not only arbitrarily but also inconsistently with its broad purposes." *Powell*, 339 U.S. at 515, 70 S.Ct. at 765.

## II

The majority attempts to buttress its cramped reading of the FLSA by arguing that Congress could not have intended the FLSA to cover prison labor because Congress' "concern with unfair competition on account of prison-made goods had been dealt with in the Ashurst–Sumners Act." Opinion at 4328. Ashurst–Sumners permits goods produced in pilot prison programs to be sold in interstate commerce provided prisoners are paid prevailing wages, less appropriate deductions. *See* 18 U.S.C. § 1761(c).

In accepting Arizona's argument that Congress intended Ashurst–Sumners to regulate the wages of prisoners to the exclusion of the FLSA, the majority ignores *Powell v. United States Cartridge Co.*, 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950). In *Powell*, the Court considered, and rejected, a similar argument that Congress intended the Walsh–Healey Act to regulate the wages of the employees of government contractors, to the exclusion of the FLSA. Like Ashurst–Sumners, Walsh–Healey contains a prevailing wage requirement, but the Supreme Court rejected an argument that Congress intended the FLSA and Walsh–Healey to be mutually exclusive.

Like the Ashurst–Sumners Act, the Walsh–Healey Act, which was also passed shortly before the FLSA, regulates the wages of a narrowly defined class of workers. In comparing Walsh–Healey and the FLSA, the Court said:

> [L]anguage [in the FLSA] discloses a congressional awareness that the coverage of the Fair Labor Standards Act overlaps that of other federal legislation affecting labor standards....
>
> Despite evidence that the two statutes define overlapping areas, respondents contend that they should be construed as being mutually exclusive. There has been no presentation of instances, however, where compliance with one Act makes it impossible to comply with the other. There has been no demonstration of the impossibility of determining, in each instance, the respective wage requirements under each Act and then applying the higher requirement as satisfying both....
>
> In some, and probably most, instances, the "prevailing minimum wages" required by the Walsh–Healey Act were more advantageous to employees than the minimum wages prescribed by the Fair Labor Standards Act.... On the other hand, the remedial procedure under the later Act was generally more advantageous to employees than the procedure under the earlier Act.
>
> We conclude that the Acts are not mutually exclusive.... We find the Acts to be mutually supplementary.

*Powell*, 339 U.S. at 518–20, 70 S.Ct. at 766–67 (footnote omitted).

This analysis in *Powell* applies with equal force here. The end result should be the same: Ashurst–Sumners and the FLSA are not mutually exclusive; they are mutually supplementary.[4]

---

4. The majority gives three reasons for disagreeing with my argument that the FLSA and Ashurst–Sumners are mutually supplementary, just as the Supreme Court in *Powell* found Walsh–Healey and the FLSA to be. *See* opinion at 1397–98, n. 18. None of the majority's reasons is responsive to my argument.

(1) The majority's first reason—that Walsh–Healey applies to "all persons employed" on government contracts, whereas the FLSA does not apply to these prisoners because they are not

"'employees' under the FLSA" (*id.*)—is circular. It assumes the answer to the very question of statutory interpretation we must decide.

(2) The majority's second reason—that Walsh–Healey and Ashurst–Sumners are mutually exclusive—is a red herring. The issue is not whether Ashurst–Sumners and *Walsh–Healey* are mutually exclusive, but whether Ashurst–Sumners and the *FLSA* are.

(3) Finally, applying the FLSA to prisoners would not, as the majority claims, render Ashurst–Sumners superfluous any more than ap-

 

The majority's reliance on Ashurst–Sumners creates an internal inconsistency in the opinion. If Congress intended Ashurst–Sumners and the FLSA to be mutually exclusive in regulating prison labor, as the majority holds, then *all* prison labor would be exempt from the FLSA. Yet the majority rejects this view. *See* opinion at 1389, 1392. Since the majority rejects the idea that the FLSA categorically excludes all prisoners, I fail to see how it can at the same time hold that the FLSA and Ashurst–Sumners are mutually exclusive.

In a final attempt to impute its own intent to the Congress, the majority says that Congress must have intended to exempt these prisoners from the FLSA because Congress would not have wanted to jeopardize prison labor programs. *See* opinion at 1398. Yet the majority fails to give any clue why possible congressional concerns about jeopardizing prison labor programs should trump Congress' clearly expressed intent that the FLSA be used as a shield to protect workers from the evils attending the sale of goods produced by cheap labor. The majority's willingness to sacrifice the wages of free labor in order to deny wages to inmates working in prison labor programs is not grounded in the text or legislative history of either Ashurst–Sumners or the FLSA.[5]

### CONCLUSION

The majority's analysis seems to boil down to the proposition that as long as Arizona law forces prisoners to work, the prisoners do not have to be paid. I simply fail to see the logical connection between the fact that the prisoners are forced to work and the question whether the FLSA applies. I see no reason to allow prison industries to compete unfairly in the marketplace by selling goods made by cheap inmate labor because some

judges feel that prisoners should not be paid the minimum wage for work they are required to do. Neither a plain reading of the Fair Labor Standards Act, nor a faithful adherence to its goal of maintaining a minimum standard of living for workers generally, justifies such a result.

---

plying the FLSA to employees of government contractors makes Walsh–Healey superfluous.

**5.** Nor, I would add, is it grounded in reality. The majority's concern that the FLSA does not expressly allow states to garnish a portion of prisoners' wages to pay the state for room, board, and victim compensation is misplaced. *See* opinion at 1398. Just because the FLSA does not provide for such payments does not mean that Congress intended to prohibit a state from taking deductions from a prisoners' earn-

ings to cover these items. Indeed, the State of Arizona already provides for such payments whenever a prisoner receives at least the minimum wage. *See* Ariz.Rev.Stat. 31–254(E). It is inconceivable that Congress would make a state pay prisoners the minimum wage *plus* room and board, or prohibit a state from requiring prisoners to make payments to their victims out of their earnings. In fact, the statute recognizes that in certain circumstances a portion of a worker's wages may come in the form of employer-provided board and lodging. *See* 29 U.S.C. § 203(m).